## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **WAYNE M. KLOCKE, INDEPENDENT** | § | |
| **ADMINISTRATOR OF THE** | § | |
| **ESTATE OF THOMAS KLOCKE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Civil Action No. _____** |
| | § | |
| **THE UNIVERSITY OF TEXAS AT** | § | |
| **ARLINGTON and NICHOLAS** | § | |
| **MATTHEW WATSON,** | § | |
| | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Wayne M. Klocke, Independent Administrator of the Estate of Thomas Klocke, files this Complaint against Defendants The University of Texas at Arlington and Nicholas Matthew Watson, and respectfully shows the following:

### NATURE OF THIS ACTION

1. This action addresses Defendant The University of Texas at Arlington's ("UTA") actionable misconduct in responding to allegations of misconduct by one of its students -- Defendant Nicholas Watson's ("Watson") – against another UTA student-- Thomas Klocke ("Thomas"). It also addresses Watson's false and defamatory publication of his allegations regarding Thomas.

2. Prior to filing this complaint, Plaintiff conducted court-authorized pre-suit depositions of two UTA employee administrators—Heather Snow ("Snow") and Daniel Moore

("Moore").  Plaintiff also received pertinent documents from UTA.  The allegations made in this complaint are based in part, on the sworn testimony and contents of the documents Plaintiff received.

3.      On or about May 19, 2016 during a class at UTA, Watson (a gay male student) made unwelcome sexual advances or overtures toward Thomas (a heterosexual male student). When Thomas immediately rejected those advances and overtures, dialogue ensued between the two students. Disappointed by the rejection, or perhaps fearing that Thomas might complain to UTA about Watson's behavior, because it constituted sexual harassment against Thomas (under UTA's published policies and procedures), Watson reached out to Snow -- UTA's Associate Vice President of Student Affairs and Dean of Students.  As an advisor and advocate for Watson, Snow helped him draft a written complaint against Thomas, advised him to send it to her alone, then proceeded to grossly abuse her position to ensure that Thomas was severely disciplined[1].

4.      Snow intentionally disregarded and circumvented the requirements of Title IX (including UTA's published policies, procedures, and directives for investigating and resolving allegations of misconduct that fall within its Title IX investigation and disciplinary policy and procedure).   She selectively implemented and enforced an alternative grievance resolution process that was deliberately indifferent to UTA's Title IX obligations and Thomas' rights thereunder.  As a result of her actions, Thomas was denied the impartial investigation and fair and impartial hearing that he was entitled to under both UTA's Title IX investigation and disciplinary procedures, and by Title IX itself.

---

[1] It should be noted that at all relevant times, UTA considered the allegations at issue to involve complaints of sexual harassment or sexual violence, as the terms are described in UTA's policies and procedures, and used and understood under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1391, and the regulations promulgated thereunder ("Title IX"), although UTA never treated them as such, and circumvented those procedures.

**ORIGINAL COMPLAINT**                                                                                    **Page 2**

5.      Snow summarily decided that Thomas committed a violation of UTA's student code of conduct based solely on Watson's bare, unsupported, reported allegations.  She assigned Moore with the task of making sure Thomas was punished and sanctioned for the same -- swiftly and harshly. Snow and Moore never deviated from their pre-casted conclusion that Thomas committed a disciplinary offense for which he would be punished and sanctioned, even after discovering that there literally was no evidence to corroborate Watson's allegations against Thomas. And Snow and Moore eventually retaliated against Thomas for refusing to admit guilt, and for complaining that Watson was the one who had violated UTA's student code of conduct.

6.      The result of UTA's pretextual investigation of the incident reported by Watson (which defamed Thomas), and its selective enforcement of its grievance procedures, both of which occurred on a discriminatory basis, was an erroneous outcome, *i.e.*, a decision that Thomas committed a student code of conduct violation that he did not commit.

7.      Thomas also suffered the denial by UTA of the benefits and privileges of an educational opportunity, program and activity that he was eligible and entitled to receive. The actionable misconduct of UTA and Watson further foreseeably injured Thomas, causing him immense embarrassment, the destruction of his reputation and severe mental anguish and pain, all of which causally led to Thomas' self-inflicted death on June 2, 2016.

## PARTIES

8.      Plaintiff is the duly appointed independent administrator of the Estate of Thomas Klocke.  At the time of the events made the basis of this suit, Thomas was a resident of Tarrant County, Texas, and a student at UTA.

9.      Defendant The University of Texas at Arlington is an agency of the State of Texas and a federally funded institution of higher education.  UTA may be served with summons and

complaint by serving its President, Vistasp M. Karbhari, at 701 South Nedderman Drive Arlington, Texas 76019.

10.     Defendant Nicholas Matthew Watson is an individual who committed the torts complained of herein in Tarrant County, Texas.  He may be served with summons and this Complaint at 801 Sylvan Drive, Fort Worth, Texas 76120.

## JURISDICTION AND VENUE

11.     The Court has federal question jurisdiction and supplemental jurisdiction, respectively, pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1367 because:  (i) Plaintiff states a claim under the laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88; and (ii) the state law claims asserted herein are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

12.     The Court has personal jurisdiction over Defendants on the grounds that Defendants conduct business, and/or committed the wrongful acts complained of herein, in Tarrant County, Texas.

13.     Venue properly lies in this Court pursuant to 28 U.S.C. §1391 because Defendants are considered to reside in this judicial district and/or a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

**A.     Thomas was an enrolled male student at UTA with full eligibility to participate in UTA's educational programming, activities and opportunities.**

14.     At all times relevant, Thomas was a male student who was enrolled in a course at

UTA that constitutes an educational opportunity, program or activity.[2]  He was fully eligible to receive and enjoy all of the benefits and privileges of such enrollment, and of that educational opportunity, program or activity.

15.     In their pre-suit depositions, Snow and Moore testified that they did not know Thomas or know of him, prior to May 19, 2016.  They also confirmed that they knew of no prior history or reports of misconduct by Thomas of any kind, at UTA or otherwise.

16.     Thomas had a solid academic record and was planning to attend graduate school, following his graduation from UTA in the summer of 2016.  He needed to successfully complete the Course during the May 2016 time frame, to graduate.

**B.     UTA is a federally funded university that is required to comply with the requirements of Title IX.**

17.     UTA is and at all times relevant, has been a federally funded university.

18.     UTA has and publishes rules and regulations governing student conduct that describe impermissible behavior that may be subject to discipline.  It also has and publishes disciplinary procedures that are to be employed and followed when a student is accused of conduct that may be a violation of its rules governing student conduct.

19.     UTA's published policies and procedures prohibit sexual harassment and sexual violence, as well as general harassment.[3]  The purpose of UTA's Policy 9 is to prescribe standards of conduct expected of enrolled students, specify disciplinary penalties which can be imposed when conduct does not conform to prescribed standards, and establish due process procedures for the imposition of such penalties.  *See,* Policy 9, II.A.2, "Purpose and Scope."

---

[2] Thomas and Watson were enrolled in an organizational strategy course – MANA 4322-01 (the "Course").

[3] *See,* UTA Handbook, Policy 9 – "Student Conduct and Discipline, Subchapter 9-200 II, B(1)(v.) and (w.), a true copy of which is attached as Exhibit "A" to this Complaint.

UTA's duties and obligation in investigating a violation of its conduct rules, like its procedures for conducting disciplinary proceedings, vary depending on the nature of the alleged misconduct.

20.     UTA also publishes directives specifically telling students what to do if they think they have been sexually harassed or victimized.   *See,*  http://www.uta.edu/titleIX.   UTA specifically directs such students to contact UTA's "Title IX Coordinator" at a specific telephone number, or by email, or to submit a complaint form to the "Title IX Coordinator" at a designated fax number.  In May of 2016, UTA clearly identified Jean Hood as its "Title IX Coordinator," in various locations on the UTA website, and in other easily accessible publications.[4]  According to additional published information disseminated and published by UTA to its students, the Title IX Coordinator is the sole university official responsible for ensuring that UTA complies with Title IX, including responding to and investigating complaints of gender discrimination (which includes sexual harassment and sexual violence) at UTA.  And, UTA's published directives to students inform them that access to "Title IX Deputy Coordinators" occurs only via the filing of a report to or with the "Title IX Coordinator" who coordinates their involvement in any ensuing investigation.

**1.     The "Dear Colleague" letter of 2011.**

21.     In April of 2011, the Assistant Secretary of the United States Department of Education Office for Civil Rights sent a comprehensive "Dear Colleague" letter to all federally funded universities to provide guidance on Title IX's requirements related to student-on-student sexual harassment, including sexual violence[5].  It "explains schools' responsibilities to take

---

[4] UTA also directs students who believe they are victims of sexual violence to contact the "UT Arlington P.D."
[5] The "Dear Colleague" letter may be located at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

immediate and effective steps to end sexual harassment and violence," including gender based

harassment, which includes acts of verbal, non-verbal, or physical aggression, intimidation or

hostility based on sex or sex stereotyping, even if those acts do not involve conduct of a sexual

nature, in addition to unwelcome sexual advances and conduct of a sexual nature.

22.     In the "Dear Colleague" letter, recipients of federal financial assistance (like

UTA) were admonished that they *must* comply with the procedural requirements outlined in the

Title IX implementing regulations, including "designat[ing] at least one employee to coordinate

its efforts to comply with and carry out its responsibilities under Title IX," and "adopt[ing] and

publish[ing] grievance procedures providing for prompt and equitable resolution of student . . .

sex discrimination complaints."[6]

23.     The "Dear Colleague" letter also explains that Title IX regulations require

institutions like UTA to notify all students of the name and contact information of its Title IX

Coordinator, whose "responsibilities include overseeing all Title IX complaints, and designate

who is responsible for handling student complaints, noting that such person should be free of

conflicts of interest such as serving as a disciplinary hearing board member."   The letter

emphasizes that Title IX coordinators must have adequate training on what constitutes sexual

harassment, including sexual violence, so as to understand and ensure compliance with the

school's Title IX grievance procedures.

24.     One of the emphasized features of a compliant Title IX grievance procedure,

according to the "Dear Colleague" letter, is that schools must use a preponderance of the

evidence standard to evaluate complaints.   The letter also reminds schools like UTA that

---

[6] Sex discrimination includes complaints of sexual or gender based harassment, in the "Dear Colleague" letter and under Title IX.

**ORIGINAL COMPLAINT**                                                                          **Page 7**

"throughout a school's Title IX investigation, including at any hearing, the parties must have an equal opportunity to present relevant witnesses and other evidence, and both the complainant and alleged perpetrator must be afforded similar and timely access to any information that will be used at the hearing."

> **2.** **UTA's "Title IX Investigations" policy and disciplinary procedure, in 2016.**

25. In its Policy 9, UTA publishes a specific policy and procedure for investigating and responding to "Title IX Complaints." *See,* Subchapter 9-900, II., I. It defines what constitutes a "Title IX Complaint" and *mandates* that allegations of sexual misconduct, including but not limited to sexual harassment, sexual assault and sexual violence, be *investigated and resolved* as Title IX Complaints, in accordance with UTA's usual disciplinary process and procedure (Subchapter 9-300) with the following exceptions:

  a. All such "Title IX complaints" must be immediately reported to the Title IX Coordinator;

  b. The Title IX Coordinator is ultimately responsible for oversight of the investigation and resolution of *all* Title IX complaints; and,

  c. The Title IX Coordinator shall work with the Title IX Deputy Coordinator for students to assign a Title IX Investigator *in the place* of the Conduct Officer, who otherwise administers the disciplinary proceedings.[7]

The "Title IX Investigations" policy further mandates the following:

  a. Preparation of a report by the Title IX Investigator after conducting any necessary investigation and assessment, detailing the facts gathered; and,

  b. Forwarding of the report to the Deputy Title IX Coordinator *and* the Title IX Coordinator for review *before*

---

[7] The policy does not authorize a Title IX Deputy Coordinator to exclude a Title IX Coordinator from an investigation, and to oversee it alone.

any hearing, to ensure oversight of the investigation and compliance with the disciplinary procedures and federal laws.

**C.    Bias and stereotyping against males accused of sexual harassment, sexual violence or aggressive behavior.**

26.    Plaintiff alleges that The University of Texas System, on behalf of all of its branches (including UTA), have sought prestige and publicity portraying themselves as leaders in curtailing sexual harassment, sexual violence and aggressive behavior on campus.  For public relations purposes, and to preserve their federal funding, eligibility, the member branches of the University of Texas System (including UTA) have a vested interest in enacting swift and harsh punishment (almost always upon males) who are *merely accused* of sexual harassment, sexual violence or aggressive behavior, in order to preserve the appearance of their leadership on the issue of curtailing the same.

27.    Plaintiff further alleges that in this case and (on information and belief) in others, UTA permissively has allowed investigative and disciplinary procedures other than those which are required by law or by their published policies and procedures (often with pre-determined outcomes), that are designed to unfairly discriminate against males accused of sexual harassment or sexual violence, and to punish them swiftly and severely, particularly if they refuse to admit to allegations asserted against them.

28.    Plaintiff alleges that UTA discriminated against Thomas based on his gender and status as an accused male aggressor. As detailed below, when Watson reported a complaint against Thomas, Thomas was denied a proper Title IX investigation into Watson's allegations and he was denied a hearing, including a Title IX hearing.  Thomas was pre-judged guilty of a student code of conduct violation.  He was punished for the same, even though Snow and

Moore—who punished Thomas – knew there was no evidence to support the allegations against Thomas or the punishment they imposed.   Snow and Moore were aggravated that Thomas refused to admit guilt, and they were deliberately indifferent to Thomas' report that Watson had engaged in misconduct.

29.     UTA's disparate treatment of the respective reported allegations of misconduct by Watson and Thomas could not have been more blatant.   UTA leapfrogged over any investigation or hearing of the allegations against Thomas – presuming and finding him guilty of a disciplinary code violation merely because of the allegations.   In contrast, UTA completely ignored Thomas' allegations against Watson, subjected him to no investigation or disciplinary inquiry at all, and chose instead, to retaliate against Thomas for accusing Watson of misconduct, and not admitting his own guilt.

**D.     Watson's complaint and UTA's improper response.**

30.     Snow admits that she and Watson knew each other before May 19, 2016, and that they had a friendly relationship such that Watson casually referred to Snow by her first name, even when communicating with her in her official capacity.   Before Watson wrote up a complaint against Thomas, he "went to Snow" to tell her his story.   Snow *advised* him what to do.   Based upon the incident he described to her verbally, Snow became an advisor to and advocate for Watson, assisting him in writing up his complaint against Thomas.   She was not acting as a neutral, unbiased or impartial UTA administrator.

31.     At 12:13 p.m. on May 19, 2016, Watson sent an email to Snow that Snow previously advised him to prepare and send to her, alone.   In his email to "Heather," Watson accused Thomas of being an aggressor during a class that morning.   He claimed that after commenting about privilege in today's society, Thomas opened his laptop and typed into his web

browser's search bar "Gays should die."  Watson alleges he typed into his own web browser search bar, "I'm gay."  Watson further accused Thomas of feigning a yawn and stating, "well then you're a faggot."  Stating that he told Thomas, "I think you should leave," Watson told Snow that he felt terribly scared and uncomfortable, after which Thomas supposedly told him "you should consider killing yourself."  Watson confirmed that he waited until the class ended, and approached the professor about the incident.  Although the professor supposedly advised Watson to go to student support services, Watson chose only to contact his friend, Snow.

32.     Snow has testified that she viewed Watson's complaint as an allegation of sexual harassment and sexual violence of the type prohibited by Policy 9, subchapter 9-200 II.B.(1)(v.). At no time, however, did Snow advise or direct Watson to file a report of his allegations with UTA's Title IX Coordinator or UTA's police department, and Snow herself never reported the incident in question to UTA's Title IX Coordinator, or the UTA police department. Watson's complaints and allegations against Thomas were never reported to UTA's Title IX Coordinator. Snow also never communicated with Thomas.  Had she done so, she would have learned that he vigorously denied and disputed Watson's allegations, and that he considered himself the recipient of harassment by Watson.

33.     Snow decided to circumvent UTA's Title IX procedures by processing and responding to Watson's complaint, in her own way.  When she did so, she knew that involving UTA's Title IX Coordinator would have invoked UTA's protective Title IX procedures, and that Ms. Hood would displace her in coordinating the investigation and resolution of Watson's complaint against Thomas, on a Title IX-compliant basis.  In turn, Snow would lose the opportunity to dictate the process that would be implemented to ensure Thomas was swiftly and harshly punished and sanctioned, merely for being an *alleged* male aggressor.

34.     Snow made the decision that rather than involving UTA's Title IX Coordinator or process, she would assume full control over processing and responding to the very same complaint that she, in whole or in part, had drafted for Watson.  Toward that end, she reached out to Moore -- UTA's Associate Director of Academic Integrity -- and directed him to immediately notify Thomas that he was prohibited from attending and participating in the Course.  She also directed that Thomas not be told Watson's name, and that Thomas should be prohibited from contacting *anyone* in the Course, directly or via someone acting on his behalf, in any manner. Snow directed Moore to proceed in this manner, before she ever sent Watson's complaint to him. And, Snow never informed Moore that the matter should be handled in accordance with UTA's Title IX procedures. [8]

**E.     Moore addressed Watson's complaint as a "Conduct Officer" -- not in accordance with UTA's Title IX Investigations policy and disciplinary procedure, or as a Title IX Investigator.**

35.     When asked during his pre-suit deposition to describe his duties and responsibilities as Associate Director of Academic Integrity, Moore did not identify serving as a Title IX investigator, as being among them.  He testified that while he routinely was involved in disciplinary proceedings at UTA, they generally involved allegations of academic misconduct, such as cheating. He testified that allegations of harassment were usually presided over by his boss – Charity Stutzman – the UTA "Director of Community Standards."  According to Moore, he occasionally became involved in such matters only on an "as needed" basis,  and he became involved in this particular matter because Ms. Stutzman was on maternity leave when the alleged

---

[8] Moore was neither a Title IX Coordinator nor a Deputy Title IX Coordinator.  He had no idea that Title IX was involved in the matter, although Snow – a Deputy Title IX Coordinator -- has testified that Moore was acting as a Title IX investigator.

incident was reported to Snow, and in turn, by Snow to him.

36.     Moore testified he was acting as a Conduct Officer in the matter, as the term is defined in UTA's regular disciplinary procedures.  He immediately complied with Snow's May 19th instructions to him.  He sent a written notice to Thomas, which Thomas retrieved that afternoon.[9]  The notice informed Thomas that the Office of Student Conduct had been made aware that "[he was] involved in an alleged violation of the University Student Code of Conduct," although it failed to provide any details of what he allegedly had done or what he had been accused of doing.  It confirmed that Thomas could not attend or participate in the Course, or communicate with anyone in the Course, live or electronically (in writing or verbally), and neither could anyone acting on his behalf.  It also confirmed that he could not even enter the building in which the class met.

37.     Thomas was stunned and confused when he received the notice, and immediately reported to Moore that he had not committed a violation of the student code of conduct and was confused about the notice.  He expressed his need to attend class, and asked for more information.  But Moore ignored his request, and provided him no further information until the next day, May 20th, when he issued another letter to Thomas that Moore has described as a summons letter.

38.     Moore never informed Thomas that Moore was investigating what Snow believed was an allegation that Thomas had committed sexual harassment or sexual violence, or that Moore was acting as a "Title IX investigator." Moore made no mention to Thomas of Title IX or about his rights thereunder -- then or at any later time.  And Moore never informed Thomas that

---

[9] Snow also directed Moore to intercept Thomas at the classroom with a police officer, if he did not retrieve the letter before the next class session.

**ORIGINAL COMPLAINT**                                                                 **Page 13**

he was acting strictly as a Conduct Officer, who intended to both investigate and adjudicate Watson's complaint against Thomas without allowing a hearing, including one before an impartial hearing officer.

39.     Moore likewise failed to disclose to Thomas that pursuant to Snow's instructions, he was using Watson's bare account of the reported incident "as the evidence" against Thomas to charge him with violations of the UTA student code of conduct.  Moore also never disclosed to Thomas that beyond being the addressee in Watson's email complaint, Snow remained involved in the matter, instructing Moore about how to conduct the investigation, and how to punish Thomas.

40.     In the May 20th summons letter, without having any evidence to corroborate Watson's allegations or talking with any witnesses (although Snow had told him the day before there were witnesses), Moore formally charged Thomas with two violations of UTA's conduct code:  (a) physical abuse or threat of physical abuse;[10] and (b) a non-specific violation of UTA's general anti-harassment policy, *citing* Policy 9-200 II.B.(1)(q.) and (w.).[11]

41.     Moore never involved UTA's Title IX Coordinator in the matter and he never followed UTA's Title IX Investigation policy.  Instead, Moore's May 20th letter summoned Thomas to a May 23, 2016 meeting with him, notifying Thomas he would be given an opportunity to respond to the allegations against him or make an explanation.  According to

---

[10] Notably, Watson never accused Thomas of physical abuse or even threatening the same.  At most, Thomas supposedly told Watson to consider killing himself.

[11]  Charging Thomas with a violation of the Student Code of Conduct before investigating the incident was not only a violation of the pre-hearing report requirement under UTA's Title IX investigation policy, it also was a failure to comply with UTA's published disciplinary procedures, including 9-300(1)(a)(iii), which states *after* an investigation, the Conduct Officer may dismiss the allegations, proceed administratively under Policy 9, subchapter 9-300, II.C.1.c or proceed with notice or hearing under subchapter 9-400. It likewise was a failure to comply with Policy 9, subchapter 9-300(1)(a)(ii), which afforded Thomas the right to present witness testimony and other evidence, *before* being charged with a violation.

Moore, the summons letter transmitted Watson's May 19th email complaint (to Snow), describing it as "a statement of the evidence" supporting the allegation that Thomas harassed or threatened another student.  No list of witnesses or any witness accounts were provided to Thomas, even though the letter said the same would be provided to Thomas.  And Thomas had no way of seeking his own witness accounts of what happened in class on May 19th, because Thomas had been instructed that neither he, nor anyone acting for him, could make contact with anyone in the Course.

42.     Moore never offered Thomas an opportunity to return to the classroom before doling out an interim and final punishment and academic sanction against Thomas.  Meanwhile, Watson was given free reign to return to classroom and identify any witnesses who he believed would support his account of the alleged incident, although none ever came forward.

43.     Moore's summons letter also made clear to Thomas that the charges against him carried a penalty ranging from "being placed on notice," to expulsion from UTA.  But the summons letter did not inform Thomas that Moore would personally make findings of his guilt or innocence, or that Thomas would be denied a hearing in the matter even if he disputed the allegations against him, or he disputed any disciplinary punishment or sanctions against him.

44.     Thomas met with Moore on May 23rd.  Because of the seriousness of the charges and threatened penalties, he brought his father -- Wayne Klocke (who is a lawyer) – with him, and asked that his father be permitted to join the meeting.  Moore prohibited Wayne Klocke from joining the meeting, which deprived Thomas of the opportunity to have his father's help in better understanding:  a) the allegations and charges against him, (b) the proper or required procedures for UTA to respond to and investigate such allegations, (c) Thomas' rights to a full, impartial hearing, and, (d) what needed to happen for Thomas to resume full participation in the Course.

When Wayne described to Moore his concerns about Thomas' urgent need (and right) to attend and participate in all portions of the Course, and reiterated that Thomas wanted him to join in the meeting, Moore neglected to inform Thomas or Wayne that Wayne's involvement in the meeting was appropriate, as long as Thomas waived confidentiality, allowing his father to attend.  Of course, Moore knew Thomas waived such confidentiality and wanted his father to attend the meeting, so he effectively denied Thomas the right to have his father's assistance, without justification.

**F.    Moore also knew that Thomas disputed Watson's factual allegations and the propriety of any disciplinary sanction against him, including those Moore had proposed.**

45.    Moore's notes of his meeting with Thomas on May 23rd, show that Thomas told him the following:

a.    Thomas did not know his accuser (Watson)[12] and was concerned about how Watson knew his name;

b.    Watson sat next to Thomas in class on May 19th, and told Thomas he thought Thomas was beautiful;

c.    Thomas typed into his browser "stop – I'm straight," to which Watson typed into his browser, "I'm gay;"

d.    Watson continued glancing at Thomas and Thomas asked him to "stop;"

e.    Thomas never pretended to yawn, and Thomas told Watson to leave; then, both students stopped talking; and,

f.    Watson began typing on his phone and laughing, which Thomas found distracting, so Thomas changed seats and moved across the room after about 30-45 minutes.[13]

---

[12] Thomas did not know Watson's name.

[13] Thomas later reported that he was the one who moved, to diffuse any tension.

Thomas denied saying "gays should die," "you're a faggot," or "you should kill yourself."  He likewise denied making a comment about privilege.  Thomas told Moore he was graduating that summer and needed the class to graduate, and that he had transferred from Iowa.

46.    Later that evening, Moore emailed Thomas and told him to appear the next morning at a management office in "business 209" to take a Course exam, but in a private room. Moore showed no concern that Thomas had been excluded from the classroom in the prior days, and therefore was excluded from the classroom presentation of material to be tested on the exam, which he had no other way to receive because he was precluded from making contact with anyone in the Course.  He also told Thomas he could continue to work with his group but not attend the classroom portion of Course.  And he told Thomas he would interview a witness the next afternoon, and then would decide how the case against Thomas would proceed.

47.    Although a hearing before an impartial hearing officer, under UTA's Policy 9 – 9-400, was  the required next step in any disciplinary proceeding against Thomas, in lieu of Moore making a decision on the charges against Thomas and imposing a disciplinary sanction, Moore never informed Thomas that pursuant to UTA Policy 9, subchapter 9-300 II.(d.)(i), in cases where:  a) an accused student disputes the facts of the allegations and does not agree with the sanctions proposed by the Conduct Officer; b) the case involves a proposed sanction including suspension, academic sanctions, or suspension of rights and privileges; and, c) the accused student has not waived a hearing (Thomas never waived any hearing), the charges against the student *shall* be heard and determined by a fair and impartial "Hearing Officer" who is not the Conduct Officer (i.e., not Moore, in this case).

**G.      Moore never provided Thomas with a hearing under Title IX or otherwise, and pronounced Thomas guilty of a conduct violation, despite the absence of evidence to support his finding of guilt.**

48.     During the meeting on May 23, 2016, Thomas not only disputed the allegations against him, he reported the occurrence of conduct by Watson that constituted sexual harassment as defined in UTA's Student Code of Conduct.   But Moore opened no investigation into Watson's conduct, and offered no recommendation to Thomas to make a formal complaint of the same.   Watson was never subjected to an investigation or disciplinary proceedings, or deprived of or denied any benefits and privileges of his educational program or participation in the Course.   He suffered no sanctions of any kind, on an interim basis or otherwise, in marked contrast to how Thomas was treated based solely upon Watson's bare allegations, in his complaint to Snow.

49.     During the afternoon of May 24th, the following occurred:

    a.      Moore reported to Snow that he wanted her to know, "before finalizing" Thomas' case, that both Thomas and Watson needed the class to graduate during the summer, and that per the professor, there was no way for *Thomas* to do the class as an independent study.

    b.      Snow asked Moore what his current thoughts were, and whether Thomas acknowledged the behavior Watson accused him of. Moore told Snow "not at all," and he reported that both students had completely different accounts of what happened (Moore did not share with Snow what Thomas' account was), and that "the only nearby witness that [Moore] could get just heard the same line 'I think you should leave,' but nothing else." And Moore told Snow he didn't have enough to keep Thomas out of the class.

    c.      Snow agreed that "if there isn't enough to go off of," then allowing Thomas back into the class with a mutual no-

> contact order between the students, was the proper
> resolution of the situation.

But Moore did not proceed to finalize the case by allowing Thomas back into the class with a

mutual no-contact order being in place.

50.     After informing Snow that after speaking with a witness, he did not have enough

to keep Thomas out of class, and after Snow told him returning Thomas to class with a mutual

no-contact order was a proper resolution, Moore proceeded to punish Thomas, nevertheless.

Toward that end, he offered to seek another option before allowing Thomas back to class.  Snow

was pleased with that suggestion, and she told Moore to see if the Course was offered later in the

summer, effectively confirming that Thomas not only should remain excluded from the

classroom, but that he should be excluded from the Course altogether, despite the fact there was

not enough to go off of, to keep Thomas out of the classroom.

51.     Moore reported back to Snow fourteen (14) minutes later.  Despite previously

confirming he did not have enough to go off of to continue keeping Thomas out of the

classroom, Moore told Snow he had "worked it out" to continue keeping Thomas out of the

classroom.  Snow thanked him and declared that it seemed like a "good resolution."

52.     Moore met with Thomas the next day, and thereafter sent him a letter dated May

25th, which informed Thomas of the following:

        a.      During the May 25th meeting, Moore found that Thomas
                was responsible for harassment, as charged, and found
                there was insufficient evidence of a threat as charged;

        b.      Thomas was placed on disciplinary probation through the
                remainder of his career at UTA, and the same created a
                reportable disciplinary record; and,

        c.      Thomas would be sanctioned in the form of being restricted
                from attending or participating in the classroom portion of

the Course, while being allowed to work on group projects
outside of the classroom.

Moore never identified the witness he told Thomas he would speak to before making a decision in the case.  He never obtained a statement from that witness.  He also never told Thomas that the witness did not corroborate Watson's story or allegations, or that he had decided the day before that the proper resolution of the matter was to allow Thomas to return to class, with a mutual no-contact order, because there was "not enough to go off of" to keep Thomas out of the class.

53.     Moore also never explained to Thomas why he was found guilty of harassment, or how he could be found guilty of harassment when there was not evidence to corroborate Watson's allegations, such that Thomas could no longer properly be kept out of the classroom. Thomas was found guilty of harassment, and punished, in the absence of any evidence that justified keeping him out of the classroom, let alone that he harassed Watson.  In explaining to Thomas that he had an appeal right, Moore never told Thomas that he had been wrongfully denied a hearing before an impartial officer to determine and decide the charges against him, in the place and stead of Moore doing so.  After Thomas' death, Wayne Klocke was told that any appeal was to be directed to Snow, although neither Thomas nor Wayne were informed that she was actually a participant in making the decisions that would be the subject of such an appeal.

54.     If UTA's Title IX procedures had not been circumvented by Snow and Moore, the following should have and would have occurred:

a.      An impartial Hearing Officer would have been appointed when Thomas denied the charges against him, and disputed the proposed discipline.

b.      After the Hearing Officer read the charges and explained the parties' rights, Moore as Conduct Officer would present

evidence of the charges – but not decide them – to the Hearing Officer.

c.     Thomas would have presented evidence in his defense, and each party would present rebuttal evidence and argument.

d.     Each party would have and exchange a list of witnesses and a summary of their testimony, copies of all documents to be introduced at the hearing, five days before the hearing.

e.     Each party would have a right to cross examine witnesses and a right to have an advisor of their choosing, including an attorney.

f.     The hearing would be recorded.

g.     The witnesses would testify under oath and the parties could object to evidence offerings.

h.     The Conduct Officer (i.e., Moore) would have the burden of establishing the truth of the charges against Thomas by a preponderance of the evidence.

i.     The neutral, impartial Hearing Officer would decide responsibility, if any, and assess any punishment or sanctions.

53.     In this case, motivated by a discriminatory gender oriented bias against Thomas -- an accused male aggressor -- UTA, acting through Snow and Moore -- deliberately and intentionally selectively enforced UTA's grievance procedures in a manner that was calculated to deny Thomas due process, avoid Title IX and its protections, and ensure that Thomas was found guilty of a code of conduct violation and punished severely in the form of an academic sanction that deprived him of the rights, privileges and benefits of his educational programming opportunities and activities.   The outcome of the grievance procedures they selectively and erroneously enforced, in the place and stead of those that were required, was also erroneous, as well, and the error was caused by or motivated by the same discriminatory bias.

**ORIGINAL COMPLAINT**                                                                 **Page 21**

54.     Thomas was devastated by and distraught because of the actions and omissions that are complained of herein and their impact on his life and future.  His scholastic performance, and participation and necessary interaction with fellow students in the Course were severely impaired and his academic future and reputation were destroyed. The monies he spent obtaining the benefits of a college education were lost. And ultimately, the wrongful acts complained of herein produced in Thomas such embarrassment, rage, frenzy, and mental or emotional anguish and pain that he took his own life.

## CAUSES OF ACTION

## COUNT ONE:  VIOLATION OF TITLE IX

55.     Plaintiff incorporates paragraphs 1 through 54 above by reference and reasserts the same as if republished here.

56.     Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

57.     UTA receives federal funding.  There is an implied private cause of action for the violation of Title IX described herein.

58.     Both the Department of Education and the Department of  Justice  have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and  equitable  resolution  of  student... complaints alleging any action which would be prohibited by" Title IX  or  regulations  thereunder.  34  C.F.R.  § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added). Such prohibited actions include all forms of sexual and gender-based harassment, including acts of

verbal, non-verbal or physical aggression, intimidation or hostility based on sex or sex-stereotyping.

59.     The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved..."

60.     The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice … of the procedure, including where complaints may be filed;"

- "Application of the procedure to complaints alleging [sexual] harassment…;"

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;"

- "Designated and reasonably prompt timeframes for the major stages of the complaint  process;" and,

- "Notice to the parties of the outcome of the complaint..."

61.     A school (in this case UTA) also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training" as to what conduct constitutes behavior and allegations that constitute a complaint of misconduct that is to be investigated and responded to in accordance with Title IX and its requirements, and the university's Title IX investigation and disciplinary procedures.

62.     Title IX prohibits a person, on the basis of sex, gender, or gender stereotyping, from being excluded from participation in any educational opportunity, program or activity for which he is otherwise eligible or to be discriminated against with regard to participation in the

same, or receiving the benefits and privileges of such eligibility.

63.     Motivated by gender stereotyping and gender or sex based bias, UTA discriminatorily conducted its putative investigation of the incident of May 19, 2016, in a manner that was biased against Thomas -- the male being accused of being an aggressor.  From the outset, Snow's and Moore's biased exclusive involvement in the investigation (circumventing the required Title IX Coordinator oversight of the same and the resolution of the complaint pursuant to a Title IX-compliant procedure) was highly improper and demonstrated an inherent bias and predetermination of guilt, merely because he was an accused male aggressor.  This is, in part, evidenced by Snow's acting as an advisor and advocate for the complaining student Watson, and sponsoring the disciplinary punishment leveled against Thomas on an interim and permanent basis, despite the clear lack of evidence supporting Watson's allegations against Thomas.

64.     The investigation process Snow and Moore selected and carried out was slanted in favor of the complaining student Watson, and his allegations were taken at face-value, even though unsupported by witnesses.

65.     The disciplining decisions were made by Snow and Moore on behalf of UTA, without considering evidence or witnesses statements in support of Thomas' defense, and demonstrates UTA's favorable treatment of the complaining student solely on the basis of his gender and sexual orientation, and its unfavorable and discriminatory treatment of Thomas on the basis of his gender, gender stereotyping and being an accused male aggressor.

66.     UTA created an environment where an accused male student is fundamentally denied due process by being prosecuted and persecuted through the incorrect conduct process, under a presumption of guilt.  Such a one-sided and unfair process deprived Thomas, as a male

student, of educational opportunities, programming and activities at UTA on the basis of his sex. UTA violated Title IX by selectively enforcing its grievance procedures in a discriminatory manner, motivated by gender bias and gender stereotyping, which motivation also constituted an erroneous outcome in violation of Title IX.

67.     UTA also was deliberately indifferent to its obligations under Title IX knowing that Title IX and its procedures (including the investigatory and disciplinary procedures), applied.   Such deliberate indifference included failing to investigate and hold disciplinary proceedings in accordance with Title IX when the same were mandatory, denying any fair and equitable hearing before an impartial neutral decisionmaker, and ultimately ignoring Watson's misconduct – itself prohibited by Title IX and UTA's conduct policy.

68.     UTA also wrongfully retaliated against Thomas by intimidating and discriminating against him for refusing to admit to engaging in the conduct alleged by Watson, for disputing the allegations factually, and for complaining that Watson engaged in misconduct against Thomas.  Such retaliation also is prohibited by and is a violation by UTA of Title IX.

69.     UTA's actions in violating the requirements of Title IX, including its discriminatory actions described herein, were intentional and deliberate, and causally resulted in Thomas suffering an adverse outcome, severe injury and harm.

70.     Thomas' claims under Title IX survive his death.  On behalf of the Estate of Thomas Klocke, Plaintiff is entitled to recover from UTA an award of monetary damages, attorneys' fees and costs, and disbursements.

## COUNT TWO:  DEFAMATION AND
## DEFAMATION *PER SE* (AGAINST WATSON)

71.     Plaintiff incorporates paragraphs 1 through 54 above by reference and reasserts

the same as if republished here.

72.     Defendant Watson published statements of fact to UTA, via Snow, referring specifically to Thomas.

73.     Watson's published statements about Thomas were false and defamatory and with regard to the truth of the same, Watson was acting with actual malice, he was negligent or he is strictly liable on a *per se* basis, for accusing Thomas of a crime, and/or because his publications are presumptively injurious.

74.     Thomas suffered pecuniary injury (although no such showing is required due to the *per se* nature of the defamation).

75.     Thomas' claims survive his death, and on behalf of the Estate of Thomas Klocke, Plaintiff seeks to recover actual damages, and exemplary or punitive damages of and from Watson.

## JURY DEMAND

76.     Plaintiff requests a trial by jury on all issues that are triable to a jury, in this case.

## PRAYER

**WHEREFORE,** Plaintiff Wayne M. Klocke, Independent Administrator of the Estate of Thomas Klocke, requests that Defendants The University of Texas at Arlington, and Nicholas Matthew Watson be summoned to appear and answer this Complaint, and that judgment be entered for Plaintiff and against the Defendants, awarding Plaintiff damages, interest as allowed by law, costs of court, attorney's fees, and all such other and further relief that he may be entitled to, at law or in equity.

Respectfully submitted,

*/s/ Kenneth B. Chaiken* _____
Kenneth B. Chaiken
State Bar No. 04057800
kchaiken@chaikenlaw.com
Robert L. Chaiken
State Bar No. 04057830
rchaiken@chaikenlaw.com

**CHAIKEN & CHAIKEN, P.C.**
Legacy Town Center III
5801 Tennyson Pkwy., Suite 440
Plano, Texas 75024
(214) 265-0250 telephone
(214) 265-1537 facsimile

and

Jonathan T. Suder
State Bar No. 19463350
Todd I. Blumenfeld
State Bar No. 24067518

**FRIEDMAN, SUDER & COOKE, P.C.**
Tindall Square Warehouse No. 1
604 East Fourth Street, Suite 200
Fort Worth, Texas  76102
(817) 334-0400 telephone
(817) 334-0401 facsimile
jts@fsclaw.com

**ATTORNEYS FOR PLAINTIFF**