

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUN 7 2018

CLERK, U.S. DISTRICT COURT
By_____
          Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

WAYNE M. KLOCKE, INDEPENDENT §
ADMINISTRATOR OF THE ESTATE OF §
THOMAS KLOCKE, §
§
    Plaintiff, §
§
VS. § NO. 4:17-CV-285-A
§
THE UNIVERSITY OF TEXAS AT §
ARLINGTON, ET AL., §
§
    Defendants. §

## MEMORANDUM OPINION AND ORDER

Came on for consideration the motion of plaintiff, Wayne M.
Klocke, Independent Administrator of the Estate of Thomas Klocke,
for partial summary judgment and the cross-motion of defendant
University of Texas at Arlington ("UTA") for summary judgment.
The court, having considered the motions, the responses, the
replies, the record, including the summary judgment evidence, and
applicable authorities, finds that defendant's motion should be
granted and that plaintiff's motion should be denied.

I.

### Plaintiff's Claims

Wayne M. Klocke ("Wayne") is the father of Thomas Klocke
("Thomas"), who was a student at UTA. The operative pleading is

plaintiff's amended complaint filed April 11, 2018. Doc.[1] 117. In it, plaintiff alleges:

On or about May 19, 2016, during a class at UTA, Nicholas Watson ("Watson"), a gay male student, made unwelcome sexual advances and overtures to Thomas, a heterosexual male student. Disappointed by the rejection, or perhaps fearing that Thomas might complain to UTA about Watson's behavior, Watson contacted Heather Snow ("Snow"), associate vice president of student affairs and dean of students, who helped him draft a complaint against Thomas. Doc. 117 ¶ 3. Snow, aided by Daniel Moore ("Moore"), selectively implemented and enforced an alternate grievance resolution process that was deliberately indifferent to UTA's Title IX obligations and Thomas's rights thereunder. Id. ¶ 4. Thomas's rights to attend class, to communicate with anyone in class, and to enter UTA's business building were suspended. Id. ¶ 5. From May 19, 2016, through June 2, 2016, Thomas suffered the denial of benefits and privileges of an educational opportunity, program and activity that he was eligible to receive. UTA's misconduct caused harm so severe that it led to Thomas's death by suicide on June 2, 2016. Id. ¶ 7.

Plaintiff asserts a cause of action for violation of Title IX, which provides:

---

[1]The "Doc. __" reference is to the number of the item on the docket in this action.

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance . . .

20 U.S.C. § 1681(a). Doc. 117 ¶¶ 85-100.

## II.

### Grounds of the Motions

Plaintiff seeks judgment that UTA violated Thomas's rights under Title IX as a matter of law and leaves for trial the issues of causation and damages. Doc. 122. UTA, in turn, seeks judgment that plaintiff is not entitled to any relief. Doc. 118.

By order signed May 18, 2018, the court, consistent with the authorization contained in Fed. R. Civ. P. 56(f)(2), notified the parties that it was considering granting UTA's motion for summary judgment on the ground that the summary judgment record as a whole could not lead a rational trier of fact to find that the conduct of UTA about which plaintiff complains caused, or was a significant factor in causing, the death of Thomas. Doc. 133. The court gave each party an opportunity to respond to the order and to the response of the other party. The responses and supporting materials have been filed, Docs. 140-43, and, for reasons discussed hereinafter, there is no need for the filing of replies.

## Applicable Summary Judgment Principles

Rule 56(a) of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment on a claim or defense if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The movant bears the initial burden of pointing out to the court that there is no genuine dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986). The movant can discharge this burden by pointing out the absence of evidence supporting one or more essential elements of the nonmoving party's claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. Once the movant has carried its burden under Rule 56(a), the nonmoving party must identify evidence in the record that creates a genuine dispute as to each of the challenged elements of its case. Id. at 324; see also Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). If the evidence identified could not lead a rational trier of fact to find in favor of the nonmoving party

as to each essential element of the nonmoving party's case, there is no genuine dispute for trial and summary judgment is appropriate. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 597 (1986). In <u>Mississippi Prot. & Advocacy Sys., Inc. v. Cotten</u>, the Fifth Circuit explained:

> Where the record, including affidavits, interrogatories, admissions, and depositions could not, as a whole, lead a rational trier of fact to find for the nonmoving party, there is no issue for trial.

929 F.2d 1054, 1058 (5th Cir. 1991).

The standard for granting a motion for summary judgment is the same as the standard for rendering judgment as a matter of law.[2] <u>Celotex Corp.</u>, 477 U.S. at 323. If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. <u>Matsushita</u>, 475 U.S. at 597; <u>see also</u> <u>Mississippi Prot. & Advocacy Sys.</u>, 929 F.2d at 1058.

---

[2]In <u>Boeing Co. v. Shipman</u>, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc), the Fifth Circuit explained the standard to be applied in determining whether the court should enter judgment on motions for directed verdict or for judgment notwithstanding the verdict.

IV.

## Facts Established by Summary Judgment Evidence[3]

Watson and Thomas were students in a class that met from 8:00 a.m. to 11:45 a.m., Monday through Friday, from May 18 to June 2, 2016. On May 19, the second day of class, the two sat next to each other in an auditorium-style lecture hall. During class, Watson posted to Facebook: "The guy sitting next to me just typed into his computer 'ga;ys should die.' Then told me I was a 'fa**ot' and that I should 'kill myself.'" Doc. 124 at 182. At 8:53 a.m., Watson emailed the professor who was teaching the class, saying (in pertinent part):

> During the course of this morning's class, I sat next to a student who made me feel massively uncomfortable. He typed into his computer search bar "gays should die" and then proceeded to call me a "fa**ot" and that I "should consider killing myself." I do not feel safe in the class at this given time given the threatening presence this student has provided.

Doc. 129 at 108. Watson approached the professor, Professor Dwight Long ("Long"), after class and Long perceived that whatever Watson had to say was urgent. Id. at 95. Long read the email when he returned to his office and reported the comments

[3]The court notes that the final pages of plaintiff's brief in response to UTA's motion for summary judgment are devoted to a series of conclusory objections regarding UTA's summary judgment evidence. Doc. 131 at 48-49. As is its custom, the court is giving the summary judgment evidence the weight it deserves. In this regard, the court notes that plaintiff's own list of undisputed facts contains many erroneous citations, as well as misleading and unsupported statements. Doc. 123 at 5-24.

Watson had made in person and through the email to Jean Hood, the Title IX coordinator for UTA. Id.

Watson went to see Snow around lunchtime on May 19. He appeared visibly upset, nervous, and shaken and talked very fast. He said that he feared for his safety and did not want to be in class with Thomas. Doc. 129 at 115-16, ¶ 10. At Snow's request, Watson typed an email addressed to her explaining what had happened. Id. at 116, ¶ 11; 165. Snow forwarded the email to Moore. Id. at 5, ¶ 7. Snow advised that it would be appropriate as an interim measure to forbid Thomas from attending class and asked Moore to draft a letter to that effect. Id. at 6, ¶ 9. Moore sent Thomas a letter stating that he must cease all contact and communications with students in the class and that Thomas was prohibited from attending class and being in the business building until further notice. Id. at 22. Moore also sent a letter to Watson, telling him not to contact Thomas. Id. at 6, ¶ 10. Moore did not consider that the statements Thomas allegedly made fit within UTA's definition of sexual harassment. He considered them to be in the nature of threats or harassment generally. Id. at 6-7, ¶¶ 13-17.

At 3:56 p.m. on May 19, 2016, Thomas sent an email that Moore received the next morning. Id. at 6, ¶ 12. In the email, Thomas stated that he had received a letter saying he was

involved in an alleged violation; that he was confused by the allegations because he did not violate the Student Code of Conduct; and that he was requesting further information. Id. at 48.

On May 20, Moore spoke with Thomas by phone. Id. at 7-8, ¶ 18. Thomas stated that he "knew what this was in reference to" and he did not dispute the allegations. Thomas's demeanor was stoic and unemotional; nothing about the call made Moore think Thomas was a victim or was being framed by Watson. Thomas did not protest being out of class and said that they could talk more at a meeting scheduled for the following Monday. Id.

At 10:21 a.m. on May 20, 2016, Thomas bought a handgun at Academy Sports & Outdoors in Grapevine. Doc. 124 at 239.

On May 20, Moore met with Watson, who explained that he had made a comment about privilege in class and that Thomas had typed "gays should die" on his web browser and showed it to Watson. Watson wrote in his own search bar, "I'm gay." Thomas then acted like he was yawning with his hand over his mouth and said, "Well, then, you're a faggot." Watson told Thomas he should leave. Thomas replied, "You should consider killing yourself." Thomas packed up and left the room, returning about 15 minutes later and taking a different seat. Watson said he passed his notebook to Blake Lankford ("Blake"), a student seated next to Thomas's empty

seat with notes regarding what happened. Doc. 129 at 8, ¶ 21. After class, Watson told Long what had happened. Id. ¶ 22. Watson made very clear that he was scared of Thomas and did not feel comfortable being in class with him. Watson seemed genuinely worried and scared and Moore found him to be credible. Id. Moore spoke to Long, who verified what Watson had reported. Id. at 9, ¶ 24.

On May 23, Moore met with Thomas. Wayne came with Thomas and spoke with Moore, expressing concern that Thomas be allowed back into the class given that it was a short semester. Wayne left and Moore spoke with Thomas alone. Id. ¶¶ 25-26. Moore advised that Wayne could meet with them but Thomas would have to sign a release, which Thomas acknowledged but did not request. Id. ¶ 27. Thomas told Moore he did not know who made the accusations against him, but that the student sitting next to him had said Thomas was "beautiful." Thomas responded on his web browser, "Stop--I'm straight." The student typed into his own web browser, "I'm gay." Thomas said the student kept glancing at him and Thomas told him to stop. Thomas denied saying, "gays should die," "you're a faggot," or "you should kill yourself." Thomas said the other student was typing into his phone and laughing and Thomas moved across the room because of the distraction. Id. at 9-10, ¶ 28. Moore asked Thomas a number of questions, but Thomas kept

referring to a sheet of paper he had with him, which appeared to be a script or outline. There were often long pauses before Thomas responded and when he did, the responses were without substance. Moore found Thomas's version of events suspect. Id. at 10, ¶ 32. In every conversation with Moore, Thomas's tone was matter-of-fact and calm, lacking any emotion, even when he said he was scared of his accuser. Id. at 11, ¶ 33.

On May 24, Moore met with Blake, who said that he heard Watson tell Thomas that he should leave. Blake looked over and saw that Watson and Thomas looked really tense. After about 30 minutes, Thomas left. Id. ¶ 37. Blake leaned over and asked Watson what had happened. Watson slid over his calendar with a note of what Thomas allegedly said to Watson. Blake did not observe Watson laughing or causing a distraction. Id. ¶ 38. Thomas returned to the classroom about ten minutes later and took a seat on the other side of the room. After class, when Watson approached Long, Thomas was looking at Watson. Id. ¶ 37.

On the evening of May 24, Thomas emailed Moore, saying that he felt victimized, but also stating, "I am the one who moved to alleviate any tension." Id. at 12, ¶ 40; 90. Moore considered the statement to be inconsistent with Thomas's claim that he had moved because Watson was laughing and causing a distraction. Id. at 12, ¶ 40. Moore responded to the email that evening asking

Thomas to meet with him the next day and telling Thomas that he had spoken to Long and Long would meet with Thomas one-on-one for any instruction for the class and that Thomas would still work with his group to complete projects. Id. at 90. Thomas responded, "Thanks for your work and talking to professor Long. I really appreciate it." Id.

On May 25, Moore met with Thomas to explain his findings and discipline. He reiterated that Watson and Thomas were to have no contact. Thomas could meet one-on-one with Long and continue working with his class group on their project. At no time did Thomas protest the decision or ask any questions as to how Moore arrived at his decision. Id. at 13, ¶ 45. Moore explained that the decision could be appealed and the appeal process and that Thomas had 14 days to appeal. Id. at 14, ¶ 46. Thomas asked whether the disciplinary record would be available to employers, graduate schools, or law schools. Moore told him that it was not on an academic transcript and that few employers would request it. In any event, Thomas would have to sign a release before the disciplinary record could be provided. Id.

Moore and Long sought to make arrangements so that Thomas could still obtain the benefits of the course and obtain course credit despite not being allowed in the classroom. Id. at 96, ¶ 17. Thomas took the first exam in the business office on May 24

and received a grade of 66. Id.; at 112; Doc. 124 at 117. Thomas took the second exam on or around June 1 and received a grade of 74. Doc. 129 at 96, ¶ 17; 112. On May 31, Long met with Thomas and Long assured Thomas that he was part of the class even though he could not attend; that Long had Thomas "covered"; and that Thomas would get the same grade as every other member of his team on class participation, team presentation, and simulation. Id. at 96, ¶ 18. The meeting lasted approximately fifteen minutes. Id. ¶ 19. Long kept trying to explain the final exam to Thomas, who cut him off, saying something to the effect of "I got this." Id. at 97, ¶¶ 21-22. Thomas finished only the first two of five parts of the final exam, but Long gave him a grade of 75. Id. ¶¶ 23, 25. Thomas submitted the last of his answers at 2:14 p.m. on June 2. Id. ¶ 25. At approximately 5:20 on June 2, Thomas committed suicide by shooting himself with the gun he had purchased on May 20. Doc. 124 at 279, 281, 239.

Moore made the decision as to the potential policy violations he would investigate. No one told him what he should investigate. He was the sole decision-maker. He determined that Thomas was responsible for harassment but not making a threat. He did not feel pressure from the government or any administrators at UTA in making his decision. Doc. 129 at 15, ¶ 50. He investigated the case in the same manner he investigates all

cases. He met with witnesses, reviewed documents, weighed the credibility of the witnesses, and reached a conclusion. Id. ¶ 51.

V.

## Analysis

In this day and age, it should go without saying that when one student says to another, "people like you should die" or "you should kill yourself," the school must take such statements seriously.[4] It is not the role of the court to second-guess the decisions of school administrators. Plummer v. Univ. of Houston, 860 F.3d 767, 772-73 (5th Cir. 2017)(citing Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 648 (1999)); Doe v. Univ. of St. Thomas, 240 F. Supp. 3d 984, 989-90 (D. Minn. 2017).

As stated, supra, Title IX provides that no person shall, on the basis of sex, be excluded from or denied the benefits of any education program receiving federal financial assistance. The Supreme Court has recognized an implied private right of action for violation of Title IX. Cannon v. Univ. of Chicago, 441 U.S. 677 (1979). To establish a claim under Title IX, a plaintiff must establish that an educational institution receiving federal

---

[4]That one student bought a gun the day after the incident underscores the seriousness of the situation. Although there is no evidence that UTA had knowledge of the purchase or that Thomas ever considered harming Watson, the fact is that the weapon was obtained and could have been used against a fellow student.

13

assistance intentionally discriminated on the basis of the plaintiff's sex. Fort v. Dallas Indep. Sch. Dist.. 82 F.3d 414, 1996 WL 167072, at *3 (5th Cir. 1996).

As another district court has noted, private challenges to disciplinary proceedings under Title IX generally manifest themselves under four broad theories: (1) plaintiffs claiming an erroneous outcome of a disciplinary proceeding; (2) plaintiffs claiming selective enforcement of university procedures to students of different sexes; (3) plaintiffs claiming deliberate indifference to sexual harassment or assault on campus; and (4) plaintiffs claiming a university's actions were based on archaic assumptions about the roles and behavior of men and women.[5] Pacheco v. St. Mary's Univ., No. 15-CV-1131 (RCL), 2017 WL 2670758, at *11 (5th Cir. June 20, 2017). And, retaliation against a person who has complained of sex discrimination is another form of intentional discrimination encompassed by Title IX's private cause of action. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005).

In this case, no matter the theory, the evidence simply does not support a finding that defendant intentionally discriminated

---

[5]Although UTA seeks judgment on the archaic assumptions theory, Doc. 119 at 44-46, and plaintiff makes a response thereto, Doc. 131 at 38-39, it is clear that plaintiff is not asserting that theory as a basis for recovery. See Docs. 117 & 123. The court is satisfied that the theory simply does not apply to the facts of this case. See Pederson v. Louisiana State Univ., 213 F.3d 858 (5th Cir. 2000).

against Thomas on the basis of his sex. At best, sex played a tangential role. See Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist., 647 F.3d 156, 165 (5th Cir. 2011). The undisputed facts are that one student made comments that another perceived as threatening. The threatened student cried out immediately via social media to his friends and by email to his professor during the middle of class. After class, the threatened student spoke to the professor, who perceived that the threatened student was genuinely upset. The threatened student met with Snow, who also perceived that he was genuinely upset and afraid. Although Snow may have perceived that the comments were of a sexual nature, she did not impose her view on Moore, who was asked to investigate the matter. Moore recognized that the perceived threat should be immediately addressed and issued the letters forbidding the student who allegedly made the comments from attending class. He then undertook an investigation that led him to conclude that the comments had actually been made. The only other witness to the exchange corroborated that the threatened student told the other he should leave, which he did; when the witness asked what had happened, the threatened student showed him his notes; the student who allegedly made the threat watched as the threatened student spoke with the professor after class; and, the witness did not see the threatened student laughing or causing a

15

distraction. Moore did not believe the student who allegedly made the threat when he said that the threatened student had propositioned him. And, the statements of that student were inconsistent with his claim of innocence, i.e., that he knew what the meeting was about (that is, why he had been notified to meet with Moore) and that he had moved to avoid the tense situation. Moore made arrangements for the student who made the threat to be able to complete the class. That student did not protest or demand a hearing or appeal from the decision. He expressed gratitude for Moore's help; he met with the professor (whose help he acted like he was not interested in obtaining) and received assurance that he would not be penalized for being unable to attend class; he took the tests and continued to work with his group. Ultimately, for no known reason, the student committed suicide.

To establish an erroneous outcome theory, plaintiff must show that Thomas was innocent and wrongly found to have committed the offense and that gender bias was a motivating factor behind the erroneous finding. Yusuf v. Vassar College, 35 F.3d 709, 715 (2d Cir. 1994). Here, although plaintiff repeatedly argues that Thomas was punished based solely on Watson's uncorroborated account, the evidence does not support the argument. Rather, the only reasonable conclusion to be drawn from the evidence is that

Watson's account is corroborated. Plaintiff simply disagrees, which is not enough to show actual innocence. See Haidak v. Univ. of Mass., No. 14-CV-30049-MAP, 2018 WL 1243956 (D. Mass. Mar. 9, 2018); Pacheco v. St. Mary's Univ., No. 15-CV-1131 (RCL), 2017 WL 2670758 (W.D. Tex. June 20, 2017); Doe v. Purdue Univ., 281 F. Supp. 3d 754 (N.D. Ind. 2017). Moreover, he has no evidence to raise a genuine issue of material fact as to gender bias. See Yusuf, 35 F.3d at 715.

In a selective enforcement claim, a plaintiff alleges that, regardless of guilt or innocence, the decision to initiate proceedings[6] or the penalty imposed was affected by plaintiff's gender. Yusuf, 35 F.3d at 715; Pacheco, 2017 WL 2670758, at *18. In other words, the plaintiff must show that a person of the opposite sex was in circumstances sufficiently similar to plaintiff's and was treated more favorably by defendant. Doe v. Univ. of the South, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009).

UTA has provided evidence of other student misconduct investigations from 2013 to 2016. Doc. 120, Ex. 15. Plaintiff has not shown that any female in circumstances similar to Thomas's was treated more favorably. See Gudgel v. Del Mar College, No. 2:16-CV-513, 2018 WL 472829, at *2 (S.D. Tex. Jan. 17, 2018). In

---

[6]Here the complaint was initiated by Watson; thus, there is no selective enforcement claim based on initiation of the investigation. Doe v. Purdue Univ., 281 F. Supp. 3d 754, 784 (N.D. Ind. 2017).

fact plaintiff has not pointed to any comparator in nearly identical circumstances. See Lee v. Kansas City S. Ry., 574 F.3d 253, 259-60 (5th Cir. 2009). And, even if he had identified such a comparator, he has not shown that the same decision-maker was involved. Lopez v. Kempthorne, 684 F. Supp. 2d 827, 857 (S.D. Tex. 2010)(comparators are rarely similarly-situated where different decision-makers are involved).

With regard to deliberate indifference, plaintiff asserts two different theories. First, he says that UTA failed to follow its own policies and procedures in investigating Watson's complaint. Second, he says that UTA was deliberately indifferent to Thomas's claim of harassment by Watson. Doc. 131 at 19. Doc. 117 at 33-35, ¶¶ 92-94; 35, ¶ 97. Neither is supported.

The Supreme Court has never held that there is an implied right of action under Title IX for violation of administrative requirements. K.S. v. Northwest Indep. Sch. Dist., 689 F. App'x 780, 794 (5th Cir. 2017); Sanches, 647 F.3d at 169. But even if there is such a right, mere failure to follow policy does not establish deliberate indifference. Sanches, 647 F.3d at 169. Rather, the school's response, or lack thereof, to the harassment must be clearly unreasonable in light of the known circumstances. Id. at 167. The bar is high and neither negligence nor mere unreasonableness is enough. Id. A defendant is not deliberately

indifferent where it takes some action. K.S., 689 F. App'x at 794.

Although plaintiff disagrees with the outcome, the record reflects that UTA did consider Thomas's allegations against Watson and determine them to be incredible. And, even if UTA ignored Thomas's allegations, UTA is not liable for damages unless its deliberate indifference subjected Thomas to harassment. "That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 644-45 (1999). There is no evidence that UTA's actions caused Thomas to be subjected to harassment by Watson. Rather, UTA directed Watson to have no contact with Thomas and cautioned him that failure to abide by the restriction could result in disciplinary action against him. Doc. 120 at 480.

Further, and in any event, Thomas's allegations against Watson were insufficient to amount to a sexual harassment complaint meriting investigation under Title IX. Specifically, the alleged harassment was not "so severe, pervasive, and objectively offensive that it effectively barred [Thomas's] access to an educational opportunity or benefit." Sanches, 647 F.3d at 165. Only claims involving pervasive and widespread conduct are actionable; a single incident is not enough.

<u>Carmichael v. Galbraith</u>, 574 F. App'x 286, 289-90 (5th Cir. 2014). <u>See also</u> <u>Doe v. Miami Univ.</u>, 882 F.3d 579, 591 (6th Cir. 2018); <u>Haidak v. Univ. of Mass.</u>, 2018 WL 1243956, at *21.

Finally, plaintiff maintains that UTA retaliated against Thomas because he complained of sex discrimination. The Supreme Court has recognized that retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action. <u>Jackson</u>, 544 U.S. at 173. "[W]hen a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." <u>Id.</u> at 174. Here, the facts do not fit the cause of action.

First, Thomas did not complain of sex discrimination. At most, he reported one minor incident of harassment.[7] Further, Thomas was already under investigation for allegedly having threatened Watson and discipline had already been imposed before Thomas ever mentioned that Watson had propositioned him. Thus, there is no causal connection between Thomas's report and the adverse action. <u>See</u> <u>Gudgel</u>, 2018 WL 472829 (summary judgment granted where discipline had been imposed before the plaintiff

---

[7]Despite plaintiff's characterization, it is clear that Thomas did not independently complain about Watson's actions, but rather made the allegations in defense to the accusations made by Watson.

filed his Title IX complaint). And, as UTA notes, after Thomas made the allegations about Watson, the sanction against Thomas was actually modified in his favor to allow him to work with his group and be in the business school building and take exams. While not dispositive, this tends to show that UTA did not retaliate against Thomas for his report. Doe v. Salisbury Univ., 123 F. Supp. 3d 748, 769-70 (D. Md. 2015).

Plaintiff has not shown that UTA's actions were clearly unreasonable in light of the known circumstances. Sanches, 647 F.3d at 167. UTA is entitled to judgment as a matter of law.

## VI.

### Supplemental Filings[8]

Upon reading the May 31, 2018 briefs filed by plaintiff, Doc. 142, and UTA, Doc. 140, the court realized that it had been hasty in issuing the May 18, 2018 order raising under the authority of Fed. R. Civ. P. 56(f)(2) of the Federal Rules of Civil Procedure an issue as to causation of Thomas's death. As plaintiff pointed out in his brief, he "does not seek a finding in this case by the trier of fact that the conduct of UTA about which he complains caused or was a significant factor in causing the death of Thomas." Doc. 142 at 1. Thus, there is no need for

---

[8]The court notes that the parties have also filed a number of motions to exclude expert testimony. Docs. 145-58. These motions are moot in light of the rulings made herein.

the briefing on that issue and the court has not considered any of the documents filed in response to the May 18 order in reaching the conclusions expressed in this memorandum opinion and order. For that reason, the court is ordering that such documents be unfiled and stricken from the record of this action.

VII.

Order

The court ORDERS that the court's May 18, 2018 order be, and is hereby, vacated and set aside, and that the May 31, 2018, briefs and appendices, Docs. 140-43, be, and are hereby, unfiled and stricken from the record of this action.

The court further ORDERS that plaintiff's motion for partial summary judgment be, and is hereby, denied.

The court further ORDERS that UTA's motion for summary judgment be, and is hereby, granted; that plaintiff take nothing on his claims against UTA; and that such claims be, and are hereby, dismissed.

SIGNED June 7, 2018.

_____
JOHN McBRYDE
United States District Judge