NORTHERN DISTRICT OF TEXAS
FILED

APR - 6 2022

CLERK, U.S. DISTRICT COURT
By_____
Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

WAYNE M. KLOCKE, INDEPENDENT          §
ADMINISTRATOR OF THE ESTATE OF        §
THOMAS KLOCKE,                        §
                                      §
            Plaintiff,                §
                                      §
VS.                                   §    NO. 4:17-CV-285-A
                                      §
NICHOLAS MATTHEW WATSON,              §
                                      §
            Defendant.                §

MEMORANDUM OPINION AND ORDER

Came on for consideration the motion of defendant, Nicholas
Matthew Watson, for summary judgment and the motion of
plaintiff, Wayne M. Klocke, Independent Administrator of the
Estate of Thomas Klocke, for partial summary judgment. The
court, having considered the motions, the responses, the
replies, the record, and applicable authorities, finds that
plaintiff's motion should be denied and that defendant's motion
should be granted.

I.

Background

This lawsuit has a lengthy procedural history. It arises
out of events that occurred on May 19, 2016, during a class at
the University of Texas at Arlington ("UTA") in which defendant
and Thomas Klocke ("Thomas") were students. Plaintiff originally

sued defendant and UTA. Doc.[1] 1. Shortly after the case was filed, the court granted defendant's motion to dismiss plaintiff's claims pursuant to the Texas Citizens Participation Act, Tex. Civ. Prac. & Rem. Code §§ 27.001-.011 (West 2015), ("TCPA") and for plaintiff's failure to comply with the Texas Defamation Mitigation Act, Tex. Civ. Prac. & Rem. Code §§ 73.051-.062 (West 2017), ("DMA"). Doc. 38. The court ordered that the dismissal of the claims against defendant be made final. Doc. 77. As a matter of first impression, the Fifth Circuit determined that the TCPA does not apply in federal court and reversed the court's dismissal of the claims against defendant and remanded for further proceedings. Klocke v. Watson, 936 F.3d 240 (5th Cir. 2019).

While an interlocutory appeal of the dismissal of plaintiff's claims against defendant was pending, the court granted UTA's motion for summary judgment. Doc. 160. That ruling was upheld on appeal. Klocke v. Univ. of Tex. at Arlington, 938 F.3d 204 (5th Cir. 2019) [hereinafter "the UTA opinion"]. Plaintiff's petition for writ of certiorari was denied. 140 S. Ct. 1268 (2020).

After dismissing the claims against UTA, the court granted defendant's motion for summary judgment. Doc. 228. That ruling

---

[1] The "Doc. __" reference is to the number of the item on the docket in this civil action.

was initially affirmed, Klocke v. Watson, 861 F. App'x 524 (5th Cir. 2021), but later reversed on rehearing. No. 20-10103, 2021 WL 5871884 (5th Cir. Dec. 10, 2021).

The panel that most recently ruled says that this court cannot rely on the Fifth Circuit's prior rulings as law of the case. Klocke, 2021 WL 5871884, at *6 (referring to the summary of undisputed facts in the UTA opinion as "our findings"). This court did not believe that it was making credibility determinations in reciting from the UTA opinion. As that panel stated: "it is uncontradicted that Moore considered the following in his decision." 938 F.3d at 211. The Fifth Circuit recited the six items this court quoted in its opinion granting defendant's first motion for summary judgment. 2020 WL 438114, at *4 (quoting 938 F.3d at 211). The "credibility determinations" for which the second panel faults the court were those made by Moore in conducting his investigation on behalf of UTA. That Moore determined that Thomas's version of the facts was not credible is not disputed.[2] In any event, as defendant points out, the second opinion did not find that there was a genuine issue of material fact as to the falsity of defendant's statements or that the court's initial legal analysis of the evidentiary issues was wrong. Rather, it found that the court

---

[2] Thus, it strikes the court that to find in favor of plaintiff would require the court to overturn the judgment in UTA's favor after that judgment has become final.

did not resolve certain evidentiary issues before granting summary judgment and that it erred in finding that plaintiff had waived an argument that defendant's allegations constituted defamation per se and was unable to present competent evidence of compensable damages. Doc. 251 at 7.

II.

### Grounds of the Motions

Plaintiff seeks partial summary judgment that defendant (a) falsely published fact statements[3] that (1) damaged Thomas's reputation, i.e., his occupation as a student and any future occupation, (2) Thomas threatened or made threats against defendant, and (3) accused Thomas of sexual misconduct; (b) defamed Thomas as a matter of law; and (c) caused injury to Thomas as a matter of law. Doc. 239.

Defendant seeks judgment that plaintiff take nothing on the claims against him because (1) plaintiff cannot present competent summary judgment evidence that defendant's statements were false; (2) plaintiff cannot establish that defendant's publications constitute defamation per se; (3) plaintiff's claims are untimely; and (4) plaintiff's failure to comply with the DMA bars him from recovering exemplary damages. Doc. 245.

---

[3] In claiming that defendant published fact statements that Thomas threatened or made threats against him and accused Thomas of sexual misconduct, plaintiff grossly misrepresents the record. Defendant never made such fact statements. Rather, plaintiff has created a straw man argument out of whole cloth to support his theory of the case.

4

III.

## Applicable Summary Judgment Standards

Rule 56(a) of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment on a claim or defense if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The movant bears the initial burden of pointing out to the court that there is no genuine dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986). The movant can discharge this burden by pointing out the absence of evidence supporting one or more essential elements of the nonmoving party's claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Once the movant has carried its burden under Rule 56(a), the nonmoving party must identify evidence in the record that creates a genuine dispute as to each of the challenged elements of its case. Id. at 324; see also Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). If the evidence identified could not lead a rational trier of fact to find in favor of the nonmoving party as to each essential element of the nonmoving party's

case, there is no genuine dispute for trial and summary judgment is appropriate. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 597 (1986). In Mississippi Prot. & Advocacy Sys., Inc. v. Cotten, the Fifth Circuit explained:

> Where the record, including affidavits, interrogatories, admissions, and depositions could not, as a whole, lead a rational trier of fact to find for the nonmoving party, there is no issue for trial.

929 F.2d 1054, 1058 (5th Cir. 1991).

The standard for granting a motion for summary judgment is the same as the standard for rendering judgment as a matter of law. Celotex Corp., 477 U.S. at 323. If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Matsushita, 475 U.S. at 597; see also Mississippi Prot. & Advocacy Sys., 929 F.2d at 1058.

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Anderson, 477 U.S. at 247-48. Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

Although the court must resolve all factual inferences in favor of the nonmovant, the nonmovant cannot manufacture a disputed material fact where none exists. Albertson v. T.J. Stevenson & Co., 749 F.2d 223, 228 (5th Cir. 1984). He cannot defeat a motion for summary judgment by relying on conclusory allegations unsupported by concrete and particular facts. Duffy v. Leading Edge Prods., Inc., 44 F.3d 308, 312 (5th Cir. 1995).

IV.

### Undisputed Facts[4]

The record establishes the following undisputed facts:

On May 19, 2016, Thomas and defendant sat next to each other in a class conducted by Dr. Long ("Long") at UTA. Doc. 252 at 24-25. Defendant did not know Thomas. Id. at 1, ¶ 3. Blake Lankford ("Lankford") sat on the other side of Thomas. Id. at 19, 24. An exchange occurred between defendant and Thomas by typing on their respective computer screens and by spoken words. Id. at 1-2, ¶ 4, 15-19; Doc. 242 at 12-14, 33. Lankford could tell that defendant and Thomas were tense but he did not know what was going on. Doc. 242 at 99. He did not hear or see any exchange between the two, except that he heard defendant tell Thomas he could leave.[5] Id. at 95, 97-98, 100, 102-04. At some

---

[4] This section sets forth the facts established by the summary judgment evidence. Admissibility of the evidence is considered in the "Analysis" section of this opinion.
[5] As discussed, infra, Lankford told Moore that defendant had told Thomas to leave. Doc. 252 at 201. At his deposition, three and one-half years after the

point, Thomas left and when he returned he took another seat on the far side of the room. Id. at 100. Lankford did not recall whether defendant was using his laptop or cell phone during class. Id. at 111. He did not recall being asked whether he had observed defendant laughing or causing a distraction or saying that he did not see or hear defendant laughing or causing a distraction.[6] Id. at 112-13. And, he could not say whether defendant had engaged in distracting behavior. Id. at 119.

Immediately after the exchange, defendant posted on Facebook:

> The guy sitting next to me just typed into his computer "ga;ys should die." Then told me I was a "fa\*\*ot" and that I should "kill myself." I haven't felt this uncomfortable in a long time.

Doc. 252 at 2, ¶ 6, 28. He also sent an email to Long regarding the exchange while class was ongoing. Id. at 2, ¶ 5, 6. The email to Long stated:

> During the course of this morning's class, I sat next to a student who made me feel massively uncomfortable. He typed into his computer search bar "gays should die" and then proceeded to call me a "fa\*\*\*t" and that I "should consider killing myself." I do not feel safe in the class at this given time given the threatening presence this student has provided.

---

incident occurred, Lankford recalled defendant saying, "Well, if you don't like it, then you can leave." Doc. 242 at 95.
[6] It is clear from Lankford's deposition testimony that he simply did not recall much regarding the exchange other than the tension between defendant and Thomas and defendant's statement that Thomas should leave. Doc. 242, Ex. L. He also recalled defendant saying that he was going to talk to the professor about it. Id. at 101. His deposition took place three and one-half years after the incident occurred. Doc. 252 at 253.

I sat this morning in the top right hand corner (from
your perspective) in class. Very top row, very corner
seat.

I sincerely appreciate in any help you can provide
with this issue.

Id. at 6. Defendant did not leave his seat during class. Doc.

242 at 70.

Immediately after class, defendant met with the group he

was to do a project with, which included Lankford. Defendant

told the group members about his exchange with Thomas during

class. Doc. 252 at 257. Lankford recalled defendant saying that

Thomas had made gay slurs and said that defendant should die or

kill himself. Id. at 257, 259. Defendant said that he was going

to talk to the professor about it. Id. at 257.

Defendant spoke to Long, who advised him to report the

incident to student services.[7] Doc. 252 at 2, ¶ 8, 18, 27.

Defendant went to student services and spoke to Heather Snow

("Snow"), UTA's associate vice president and dean of students.

Id. at 2, ¶ 8, 21. Snow advised defendant to put his complaint

in writing, which he did by sending her an email. Id. at 2, ¶ 8,

27, 242. The email stated:

This is Nicholas Watson. Today, May 19th, during my
8:00 AM organizational strategy course, MANA 4322-001.
We had to move classes from 153 to 154 due to a
computer issue. At this point, I sat next to the
student who was the aggressor, Thomas Klocke.

---

[7] As Long was speaking to other students after class, he noticed defendant
pacing and trying to get his attention. Long sensed that whatever defendant
had to say was urgent. Doc. 120 at 94-95.

After commenting about privilege in today's society,[8] Thomas opened up his laptop and typed into his web browser's search bar, "Gays should die."

At which point, I typed into my search bar on my web browser "I'm gay." I was confused and was trying to understand why he was typing and showing me this.

After this, he acted like he was yawning and told me that "well then you're a faggot."

I then told him, "I think you should leave." I felt terribly scared and uncomfortable.

He then told me that "you should consider killing yourself."

I approached my professor, Dr. Dwight F. Long, regarding the incident after class. He advised I go to student support services.

I then went to Heather Snow, this email recipient, who advised me further.

Id. at 27. Snow sent the email to Daniel Moore ("Moore"), associate director of academic integrity, for investigation pursuant to UTA policies and procedures. Id. at 241.

After meeting with Snow, defendant made a second Facebook post updating his friends on the situation:

The student that threatened me today has been removed from the course pending investigation and the school is taking preventive measures to assure my safe return to class in the morning. I appreciate your concern and positive thoughts. I was really scared and even cried a bit. It's been a while since I have been approached so hatefully like this. Thank you for your support.

---

[8] Defendant later clarified that the sentence as typed would lead one to believe Thomas had made the comment, but it was really defendant. Doc. 120 at 430.

Id. at 29.

Snow sent Moore an email telling him that she would be sending a referral from a student "who felt threatened and unsafe in class." Id. at 195; Doc. 242 at 51. She advised that it would be appropriate to do an interim measure preventing Thomas from attending class. Id. Moore sent Thomas a letter dated May 19, 2016, telling him that he could not attend class and was restricted from the building where class was held. Doc. 252 at 195-96. Thomas responded by email to Moore, stating that he was "confused by these allegations as [he] didn't violate the Student Code of Conduct." Doc. 242 at 26; Doc. 252 at 196. On May 20, 2016, Moore sent Thomas a letter setting a meeting for May 23, 2016, to discuss the matter and advising that Thomas was being investigated for allegations of "threat" and "harassment." Doc. 252 at 196, 215. Enclosed with the letter was a copy of defendant's email to Snow with defendant's name redacted. Id. at 208A. At the time he began his investigation, Moore thought that Thomas's conduct might have constituted a threat. He believed that the conduct constituted harassment in that the totality of the allegations was sufficiently severe to create an objectively hostile environment for defendant. Moore did not consider the conduct to constitute sexual harassment.[9] Id. at 197. After he

---

[9] Ultimately, Moore concluded that Thomas's conduct did not constitute a threat. Doc. 252 at 202; Doc. 242 at 155.

11

sent the letter on May 20, Moore spoke with Thomas by phone to answer questions and address Thomas's concerns. Thomas said he knew what it was in reference to and did not dispute the allegations defendant had made. He was stoic and unemotional and did not protest being out of class. Nothing about the call made Moore think that Thomas was the victim of or was being framed by defendant. Thomas said they could talk more about it on Monday at the scheduled meeting. Id. at 197-98.

As part of his investigation, Moore met with defendant, Thomas, and Lankford. Id. at 199-201. Defendant made very clear that he was scared of Thomas and did not feel comfortable being in class with him. Defendant seemed genuinely scared and worried. Id. at 198. Moore was left with the impression that defendant was emotionally upset and fearful of Thomas. Moore found defendant to be credible. Id. at 199. Moore spoke to Long, who gave a description of his meeting with defendant that matched what defendant had told Moore. Id.

On May 20, Thomas stayed in his room with the door closed for a large part of the day. Doc. 242 at 127. He missed a bachelor party prior to his sister's wedding. Id. Although plaintiff, Thomas's father, had not seen that type of behavior before, he did not talk to Thomas about the behavior that day or the next. On May 22, Thomas asked to meet with plaintiff and informed plaintiff then that he had been suspended from class.

12

Id. Thomas showed plaintiff the email that accompanied Moore's May 20 letter. Thomas said that defendant sat next to him in class and told him he was beautiful. Plaintiff's immediate reaction was that Thomas needed to have a hearing. He was angry that Thomas had been barred from class based on defendant's allegations without any opportunity to give his side of the story or to defend himself. Id. at 128.

Plaintiff appeared with Thomas on May 23 for the meeting with Moore. The three met, then plaintiff left and Moore spoke with Thomas. Moore told Thomas they could meet with plaintiff present, but Thomas never requested (then or anytime thereafter) that plaintiff participate. Doc. 252 at 199. Thomas told Moore that defendant (whose name he did not know) had told Thomas he was beautiful, to which Thomas responded in his web browser, "Stop--I'm straight." Defendant then typed "I'm gay." Thomas said defendant kept looking at him and Thomas said "stop." Defendant told Thomas to leave. Thomas said defendant started typing on his phone and laughing, which was distracting to Thomas. After some time, Thomas moved seats.[10] Thomas denied saying "gays should die," "you're a faggot," or "you should kill

---

[10] Thomas later sent an email to Moore, expressing that he felt victimized and that defendant was a threat to him, noting that he was "the one who moved to alleviate any tension." Doc. 242 at 36. Moore took the email to be an acknowledgment of the tension between Thomas and defendant, but found it to be inconsistent with Thomas's prior statement that he changed seats because defendant was laughing and causing a distraction. Doc. 252 at 202.

yourself." Id. at 199-200. During the meeting, Thomas had a
sheet of paper that he kept referring to, which appeared to be a
script or an outline from which he did not deviate. Thomas
claimed to be scared of defendant, but could not say why.
Whenever Moore asked questions, Thomas would consult his
script.[11] Thomas's responses to follow-up questions lacked any
substance and Moore found his version of events suspect. Id. at
200.

During the meeting, Moore told Thomas that he would be able
to work with his group and to go back into the business building
to do so, although he was not to attend class. Moore told Thomas
to prepare for his exam the following day and that Moore would
make arrangements for him to take it. Doc. 252 at 200; Doc. 242
at 34. One of Thomas's classmates saw Thomas on May 24 and noted
that he had not been in class for the exam. Thomas told his
group that he had to meet with Long to take the exam. Thomas
asked how the test was and seemed stressed after the group told
him it was hard. Doc. 242 at 135. On May 24, Moore met with
Lankford. Doc. 252 at 201. According to Moore, Lankford reported
that he heard defendant tell Thomas he should leave.[12] Lankford

---

[11] The record appears to contain two versions of the script. Doc. 120 at 1823
and 1825. Each contains the notation "*Pause" after the opening line. Id.
[12] As noted, at his deposition three and one-half years later, Lankford
recalled defendant saying, "Well, if you don't like it, then you can leave."
Doc. 242 at 104. Thomas's notes reflect that defendant "told me to leave in a
raised voice," Doc. 120 at 1825, or, alternately, "he told me to leave." Id.
at 1823.

looked over and saw that defendant and Thomas looked really tense. After approximately fifteen minutes, Thomas left the room. When he did so, Lankford leaned over and asked defendant what happened. Defendant slid over his calendar with a note of what Thomas allegedly said to defendant. Lankford confirmed the substance of the note defendant had given Moore.[13] Lankford told Moore that he did not see or hear defendant laughing or causing a distraction. Thomas returned to the room about ten minutes later and sat on the other side. After class, defendant approached Long and Thomas was watching defendant.[14] Id.

On May 24, Moore and Snow emailed each other. Moore reported that defendant and Thomas gave two completely different accounts of what had happened and that the only witness, Lankford, just heard defendant tell Thomas to leave. Doc. 242 at 54. Snow responded that if there was not enough to go on, they should facilitate a very strict, professor supported no contact order. Id. Moore responded that the defendant's account was more believable (although he did not have anything to corroborate

---

[13] The calendar note is found at Doc. 120 at 81. At his deposition, Lankford could not recall whether defendant had sent him a note or what he said after Thomas left. Doc. 252 at 257. When shown the note, he did not recall whether defendant had showed it to him in class. Id. at 260.
[14] The notes of Moore's meeting with Lankford are found at Doc. 120 at 88. Lankford was apparently questioned about the notes of Moore's interview with him, but that part of the deposition is not included in the summary judgment evidence in support of the pending motions. Doc. 252 at 254 (referencing Ex. 6).

it)[15] and that he would talk to Long about other options before allowing Thomas back in class. Id. at 53. Moore had two competing objectives:

> On one hand, I thought that [Thomas's] conduct was a policy violation, had caused a genuine fear for [defendant], and [defendant] did not want [Thomas] back in class. I thought [Thomas's] conduct was sufficient to warrant discipline that did not allow [Thomas] back for class sessions. On the other hand, I knew [Thomas] needed the class to graduate and intended on graduating in August. I did not want the discipline to prevent [Thomas] from being able to do so.

Doc. 252 at 203. Twenty-one minutes later he reported to Snow that he had discussed the matter with Long and that Thomas would be able to complete the class without attending. Doc. 242 at 53.

On May 24, Moore emailed Thomas to say that he had spoken to Long and that Long would meet with Thomas one on one for any instruction for the class and that he would be able to continue work with his group as he had been to complete the projects. Moore suggested that he and Thomas meet the next day to discuss a final resolution. Thomas responded that he appreciated Moore's work and his talking to Long and that he was able to meet May 25 at 10 a.m. Doc. 242 at 36.

---

[15] In his declaration, Moore explained that by "corroborate it," he meant that he had no independent account from a person who overheard the entire exchange between defendant and Thomas. He did have defendant's contemporaneous note, the Facebook post, the email to Long, the report after class to Long, and Lankford's testimony, all of which aligned with defendant's account. Doc. 252 at 203.

On May 25, Moore met with Thomas to explain his findings and discipline. Thomas expressed concern that defendant could look up where he lived. Moore reiterated that Thomas and defendant were to have no contact. He told Thomas to let him know if he felt he was being harassed or stalked. He told Thomas that he could meet one on one with Long and continue working with his group. Moore believed Thomas would be able to obtain credits for the class and graduate in August. Thomas did not protest the decision or ask any questions about it. Doc. 252 at 203. Thomas expressed concerns about his disciplinary record and whether employers, graduate schools, or law schools would be able to access it. Moore explained that the disciplinary record was not on the academic transcript and would not be released without Thomas's authority. Moore also explained that Thomas could appeal the decision and told him how to do so. Id. at 204.

On May 31, 2016, Long met with Thomas and assured Thomas that he was part of the class even though he could not attend; that Long had Thomas "covered"; and that Thomas would get the same grade as every other member of his group on class participation, team presentation, and simulation. Doc. 120 at 96. Long told Thomas that he would not be negatively impacted by his inability to attend class. Id. at 97. The meeting lasted approximately fifteen minutes. Long kept trying to explain the

final exam to Thomas, who cut him off several times, saying something to the effect of "I got this." Id. at 96-97.

On June 1, 2016, plaintiff played pool with Thomas at their home. Thomas seemed unhappy and stressed, and, in hindsight, probably depressed. Doc. 242 at 129. He was withdrawn. Id. at 130. On June 2, 2016, Thomas committed suicide. Doc. 252 at 248.

Plaintiff has formed the belief that Thomas committed suicide because

> he was devastated by what had happened to him with
> respect to his class. He was embarrassed, alienated.
> He'd been isolated. He enjoyed his small group. He
> told me so. He was upset that he wasn't able to
> contribute. He was upset that he'd been barred from
> the lectures, and he was going to get a grade that he—
> probably didn't meet his expectations or hopes. And he
> was—he was distraught, severely distraught over the—
> the [] allegation and the fact that the university
> had—the way they'd handled it.

Doc. 242 at 131-32. He has hired an expert who is expected to testify

> that Thomas [] was severely, adversely and immediately
> impacted by the allegations lodged against him by
> [defendant] and by the consequent and cascading
> disciplinary actions levied against him by officials
> from UTA without confirmatory evidence or witnesses
> such that he took his life as a result.

Id. at 144-45.

On April 4, 2017, plaintiff filed his original complaint in this action. Doc. 1. He sued defendant for defamation based on the May 19, 2016 email to Snow. Id. at 25-26, ¶¶ 71-75. On August 24, 2017, plaintiff sent a request for correction,

clarification, or retraction of the May 19 email. Doc. 252 at 251-52.

On September 30, 2019, plaintiff filed his amended complaint, this time alleging defamation based on the two Facebook posts as well as the email to Snow. Doc. 177.

V.

Analysis

A.   Defamation in the Context of This Case

The elements of a defamation claim are: (1) the publication of a false statement of fact to a third party; (2) the statement was defamatory concerning the plaintiff; (3) the publisher acted with the requisite degree of fault; and (4) plaintiff suffered damages, unless the statement was defamatory per se. Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc., 603 S.W.3d 409, 417 (Tex. 2020); In re Lipsky, 460 S.W.3d 579, 593 (Tex. 2015). A statement is defamatory if it tends to "harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Innovative Block, 603 S.W.3d at 417. In suits like this one, truth is a defense. Warren v. Fed. Nat'l Mortg. Ass'n, 932 F.3d 378, 383 (5th Cir. 2019).

"If a statement is not verifiable as false, it is not defamatory." Dallas Morning News, Inc. v. Tatum, 554 S.W.3d 614, 624 (Tex. 2018). "For a statement to be actionable in

19

defamation, it must expressly or impliedly assert facts that are objectively verifiable." Palestine Herald-Press Co. v. Zimmer, 257 S.W.3d 504, 509 (Tex. App.—Tyler 2008, pet. denied). But, even when a statement is verifiable as false, it does not give rise to liability if the entire context in which it was made discloses that it is merely an opinion masquerading as a fact.[16] Tatum. 554 S.W.3d at 624.

Plaintiff makes clear in his summary judgment briefs that "what the case is actually about" is defendant's publication to UTA officials that Thomas threatened him and acted aggressively toward him during a classroom encounter, which caused immediate exclusion of Thomas from the class, causing damage to Thomas's reputation and severe, compensable mental anguish resulting in his suicide. Doc. 255 at 1-2; Doc. 240 at 1-2. According to plaintiff, there was no threat and, therefore, defendant is liable for defamation. Id. This argument overlooks that Thomas's alleged statements constituted harassment under the UTA policy and because defendant feared for his safety, excluding Thomas from class was appropriate even though there was no threat as such. Further, just because the definition of "threat" under UTA policy was not met does not mean that defendant did not actually feel threatened or that Thomas's words could not be perceived as

---

[16] For example, what defendant perceived or felt, e.g., that he was scared, is his opinion.

a threat.[17] In fact, the UTA opinion held that UTA had reasonable

and nondiscriminatory reasons for excluding Thomas from class

because his alleged conduct was derogatory and physically

threatening. 938 F.3d at 211-12. Thus, it seems to the court

that the crux of the case is really whether Thomas said the

things defendant attributed to him. If he did, plaintiff cannot

prevail.

There was never a finding that the conduct did not occur.

---

[17] As the summary judgment evidence establishes, defendant never used the word "threatened" in his email to Snow. Rather, he wrote that he "felt terribly scared and uncomfortable." Doc. 252 at 27. He did refer to Thomas as the "aggressor," but it was clear from the context that he meant that Thomas had started the exchange and said the things related in the email, which defendant found to be hostile and emotionally hurtful. Id. The first Facebook post does not use the word "threatened" or the word "aggressor." Id. at 28. The second Facebook post referred to Thomas as the student "that threatened me today," making clear that defendant was scared and in fear for his safety. Id. at 29. There is no evidence that defendant ever made any statement that Thomas threatened to cause him physical harm. Rather, defendant felt threatened. As defendant told Snow, what Thomas said made him feel uncomfortable and he was scared to go to class. Doc. 242 at 40.

Snow emailed Moore to tell him that she would be sending a referral from a student "who felt threatened and unsafe in a class." Doc. 252 at 195; Doc. 242 at 51. She advised that it would be appropriate to prevent Thomas from attending class. Id. To protect defendant, Moore sent a letter to Thomas telling him that he could not attend class. Doc. 252 at 195-96. He followed up with a letter advising Thomas that he was being investigated for allegations of "threat" and "harassment" under the UTA policy. Id. at 196; Doc. 242 at 28. At the time, Moore thought Thomas's conduct might have constituted a threat. Doc. 252 at 196-97. He also determined that the conduct alleged constituted harassment, but not sexual harassment. Id. at 197. Although Moore ultimately determined that Thomas's conduct did not constitute a threat under UTA policy, he perceived that defendant continued to be scared of Thomas's attending class. See Doc. 242 at 53. Thus, he reached the accommodation with Long to work personally with Thomas to finish the class. Doc. 252 at 203. Thomas did not protest the decision or ask any questions about it. Id.

Plaintiff acknowledges that defendant was the student who felt threatened. Doc. 259 at 3. He has not pointed to summary judgment evidence raising any genuine fact issue about whether defendant truly felt threatened. He offers nothing but speculation in that regard, e.g., Lankford did not observe any threatening behavior. There is no probative summary judgment evidence that defendant did not believe what he typed or that it was false.

To the contrary, Moore determined that defendant's version of
what happened was more credible. Nevertheless, plaintiff
contends that defendant cannot establish what Thomas said,
because his testimony is hearsay under Rule 801 of the Federal
Rules of Evidence. And, further, it would violate Rule 601(b)(3)
of the Texas Rules of Evidence, the "Dead Man's Rule."
Defendant, on the other hand, maintains that proof of Thomas's
version of the exchange is precluded as hearsay.

B.   Hearsay and the Dead Man's Rule

Defendant's testimony as to what Thomas said is admissible
under Fed. R. Evid. 801(d)(2)(A), as the statement of a party
opponent. Estate of Shafer v. Comm'r of Internal Revenue, 749
F.2d 1216, 1220 (6th Cir. 1984); United States v. Estate of
Mathewson, No. SA-11-CA-00018-FB, 2016 WL 7409855, at *4 (W.D.
Tex. April 19, 2016). However, because this is a state law
defamation case, state law governs the competency of witnesses
to testify. Fed. R. Evid. 601. Accordingly, the court considers
whether testimony regarding what Thomas said is barred by the
Dead Man's Rule.

Under the Dead Man's Rule, in a case like this where a
party is acting as administrator of a decedent's estate, one
party may not testify against another party about an oral
statement by a decedent. Tex. R. Evid. 601(b)(2). Exceptions
exist if (A) the party's testimony about the statement is

22

corroborated, or (B) the opposing party calls the party to testify at the trial about the statement. Tex. R. Evid. 601(b)(3). Texas courts construe the Dead Man's Rule narrowly. Lewis v. Foster, 621 S.W.2d 400, 404 (Tex. 1981); Quitta v. Fossati, 808 S.W.2d 636, 641 (Tex. App.—Corpus Christi 1991, writ denied). The rule does not prohibit testimony concerning statements of the deceased that are properly corroborated. Fraga v. Drake, 276 S.W.3d 55, 61 (Tex. App.—El Paso 2008, no pet.). Corroborating evidence must tend to support some of the material allegations testified to by the witness whose evidence is sought to be corroborated and may come from any other competent witness or other legal source, including documentary evidence. It need not be sufficient standing alone, but must tend to confirm and strengthen the testimony of the witness and show the probability of its truth. Quitta, 808 S.W.3d at 641. For example, corroborating evidence that shows conduct on the part of the deceased that is generally consistent with the testimony is sufficient. Id.

    Plaintiff contends that neither of the exceptions applies. First, he contends that defendant's corroborating evidence is all self-serving. That does not mean, however, that it is not admissible or corroborating. See Guzman v. Allstate Assurance Co., 18 F.4th 157, 161 (5th Cir. 2021)(evidence proffered by one side to defeat a motion for summary judgment will inevitably

appear self-serving). It is uncontroverted that immediately following the exchange between Thomas and defendant, defendant made his first Facebook post. He also sent an email to Long. And, when Thomas left his seat, defendant showed Lankford his calendar with notes of what Thomas said. After class, defendant told his group what had happened. And, he discussed it with Long, who advised him to go to student services. Defendant met with Snow after speaking with Long, and Snow perceived that defendant felt threatened and unsafe in class with Thomas. When Moore first spoke with Thomas on May 20, Thomas said he knew what it was in reference to and did not dispute the allegations. Moore spoke with defendant and was left with the impression that he was emotionally upset and fearful of Thomas. Moore spoke to Long, whose description of his meeting with defendant matched what defendant told Moore. All of these things tend to support defendant's testimony as to what Thomas said.

The court notes that the Dead Man's Rule sought to prevent one party from having an unfair advantage over another whose lips had been sealed by death by excluding testimony that the decedent might deny or contradict if living. Lewis, 621 S.W.2d at 404. Although Thomas was not deposed at the time, he did have

an opportunity to refute the allegations. Notably, he did not do so when he first spoke with Moore.[18] Doc. 252 at 198.

Even if the first exception did not apply, and the court is satisfied that it does, the second exception does. Although the rule speaks to calling the party to testify "at the trial" about the statement, Texas intermediate appellate courts have long recognized that affirmative use of deposition testimony, interrogatories, or requests for admissions is sufficient. Dyson v. Parker, No. 10-14-00232-CV, 2015 WL 5090730, at *3 (Tex. App.—Waco Aug. 27, 2015, no pet.); Fraga, 276 S.W.3d at 61. It does not appear that the Texas Supreme Court has addressed the matter and the court has no reason to believe that it would decide otherwise. Thus, the appellate opinions are authoritative. Exxon Co., U.S.A. v. Banque de Paris et des Pays-Bas, 889 F.2d 674, 676 (5th Cir. 1989). Allowing the testimony is fair, because the pending motions for summary judgment are, in effect, the trial in this case and plaintiff is relying on defendant's testimony to establish his claim.

The next question is whether plaintiff can rely on Moore's notes to establish that Thomas did not say the things defendant attributes to him. Plaintiff argues that (1) Thomas's denial of defendant's allegations reflected in the notes is admissible

---

[18] It was not until plaintiff became involved that Thomas refuted the allegations.

hearsay as Thomas's present sense impression, Fed. R. Evid.
803(1); (2) the notes are part of a disciplinary record, causing
them to be admissible as a record of regularly conducted
activity, Fed. R. Evid. 803(6); and (3) the denial is admissible
under the residual exception of Fed. R. Evid. 807. Doc. 240 at
11-12; Doc. 255 at 19-20. None of these arguments has merit.

Rule 803(1) excepts from the hearsay rule statements
"describing or explaining an event or condition, made while or
immediately after the declarant perceived it." The justification
for the exception is that the statement is recorded
contemporaneous with the event, such that there is almost no
likelihood of a deliberate or conscious misrepresentation.[19] Rock
v. Huffco Gas & Oil Co., 922 F.2d 272, 280 (5th Cir. 1991).
Clearly, Thomas's statements made to Moore on May 23 about
events that occurred on May 19 are not present sense
impressions.[20]

Plaintiff additionally argues that Thomas's denial and
report of a completely different account of his encounter with
defendant are kept in the disciplinary file Moore obtained and
are therefore admissible under the business records exception of
Rule 803(6). Doc. 240 at 12; Doc. 255 at 19. Plaintiff does not

---

[19] Defendant's Facebook posts and email to Long are present sense impressions.
[20] That they should not be considered such is strengthened by Moore's
impression that Thomas was reading from a script in giving his version of
what transpired. Doc. 252 at 200. See Doc. 120 at 1823 & 1825.

cite to any summary judgment evidence supporting the contention that the material is "kept in the disciplinary file Moore obtained." In any event, although Moore acted in his regular course of business in investigating the allegations and imposing discipline, Thomas was not so acting in responding to Moore's questions. His statements constitute double hearsay. That they are contained in a business record does not, by itself, permit their admission. Wilson v. Zapata Off-Shore Co., 939 F.2d 260, 271, 279 (5th Cir. 1991).

Finally, plaintiff argues that Thomas's denial is admissible under the residual exception of Rule 807 of the Federal Rules of Evidence. Doc. 240 at 12; Doc. 255 at 19-20. The rule provides that a hearsay statement is not excluded if (1) it is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts. The case upon which he relies, United States v. Thunder Horse, 370 F.3d 745 (8th Cir. 2004), upheld the admission of evidence of sexual abuse of a child in a criminal case. The court noted that the child's young age was a factor that substantially lessened the degree of skepticism with which the court viewed her motives and mitigated in favor of the

trustworthiness of her declarations. 370 F.3d at 748. Plaintiff
fails to explain how the facts of this case compare to Thunder
Horse. Here, Thomas was a young adult who understandably had a
motive to lie. Plaintiff has not shown that this, or any other,
exception to the hearsay rule applies.

C.   Other Evidence

     1.   Lankford's Testimony

     In addition to Thomas's denial as reflected in Moore's
notes, which is inadmissible, plaintiff relies on Lankford's
testimony that he saw no evidence of threats or aggressive
behavior in the classroom as support for the falsity of
defendant's publications. Doc. 240 at 12; Doc. 255 at 21. That
Lankford did not recall much about the exchange between Thomas
and defendant except that they were tense does not rise to the
level of probative evidence. He could not say whether defendant
had engaged in any distracting behavior. His recollection that
defendant told Thomas that he could leave if he didn't like it[21]
is hearsay and unreliable, being recalled three and one-half
years after the incident at issue.[22] Just after the incident,

---

[21] It is interesting that this recollection was volunteered at the very
beginning of the deposition after Lankford had spoken to plaintiff's counsel.
Doc. 252 at 255.
[22] The admissibility of Lankford's testimony regarding what he heard defendant
say is a matter that the Fifth Circuit instructed this court to consider.
2021 WL 5871884, at *2 n.2.

when he spoke with Moore, Lankford simply related that he heard defendant tell Thomas he should leave.[23] Doc. 252 at 201.

In any event, what Lankford now claims to have heard might support both versions of what happened; it does not necessarily mean that Thomas's version was true. Defendant could have called Thomas beautiful; Thomas could have responded that he was straight; Defendant could have said he was gay; Thomas could have called defendant a faggot; defendant could have told Thomas he could leave if he didn't like it, i.e., sitting next to a gay person; Thomas could have told defendant he should kill himself. Thus, speculation about the meaning of what Lankford recalls hearing does not raise a genuine fact issue for trial.

### 2.   Evidence of a Threat

Plaintiff relies on Moore's concession that he could not find any evidence of a threat as support for defamation as a matter of law. Doc. 240 at 12; Doc. 255 at 21-23. As discussed, Moore ultimately found that Thomas's conduct did not meet the definition of a threat under UTA policy. And, by saying that there was no evidence to corroborate defendant's version of the facts, Moore meant that he had no independent account from a person who overheard the entire exchange. Doc. 252 at 203. Based

---

[23] There are other discrepancies between what Lankford told Moore at the time and what he recalled three and one-half years later at his deposition. For example, Lankford testified that he did not observe defendant approaching Long after class, Doc. 242 at 106, whereas he told Moore that Thomas was watching defendant talk to Long. Doc. 252 at 201; Doc. 120 at 88.

on Moore's investigation, he found defendant's allegations to be
more credible than those of Thomas.[24] Again, that there was no
threat as such does not mean that defendant falsely reported
what Thomas said.

    3.   The Speculative Opinions of Plaintiff and His Expert

    The court set forth above the opinions of plaintiff and his
expert, Alan Berman, concerning the reason for Thomas's suicide.
Supra, at 18. Neither of those opinions would be admissible in
evidence at the trial of this action, nor is either of them
admissible as summary judgment evidence. Each of the opinions is
based on pure speculation.

    Apropos to those opinions is the conclusion the Fifth
Circuit reached in its opinion in United States v. Robinson that
"suicide is a complicated phenomenon that may be caused by any
number of preceding events." 843 F. App'x 607, 609 (5th Cir.
2021). In Robinson, the Fifth Circuit rejected as a matter of
law the district court's finding that the suicide was the
product of the victim being distraught after his girlfriend's
death, which resulted from drugs they had obtained from the
Robinson defendant.

    The court need only refer to the expert reports to fully
appreciate some of the factors that could have caused Thomas to

---

[24] That Moore found defendant's version of what happened to be more credible
is some evidence of truth.

end his life.[25] Any conclusion that anything defendant said or did caused Thomas's suicide would be pure speculation.

D.   Damages and Defamation Per Se

With regard to damages, the court first notes that although plaintiff alleges defamation based on the two Facebook posts in addition to the email to Snow, there is no evidence that Thomas or UTA ever knew of the Facebook posts. Doc. 252 at 11A (only defendant's Facebook friends could see the posts). Plaintiff does not refute this. Doc. 259. Indeed, he acknowledges that "Thomas was wholly unaware" of the posts. Doc. 240 at 17. Because the posts did not affect Thomas in some manner particularly harmful to him, plaintiff cannot show that Thomas was damaged by them. Cf. In re Lipsky, 460 S.W.3d at 596. In other words, there was no actual injury. Innovative Block, 603 S.W.3d at 426; Brady v. Klentzman, 515 S.W.3d 878, 887 (Tex. 2017).

Establishing an actual injury is necessary here, because defendant's statements do not meet the definition of defamation per se. A statement is defamation per se only if it falls into one of four categories: (1) injury to a person's office, profession, or occupation, Hancock v. Variyam, 400 S.W.3d 59, 66 (Tex. 2013), (2) imputation of crime, Leyendecker & Assocs.,

---

[25] See pages App. 006-007 of Berman report, Doc. 262. See also report of defendant's expert, Morton Silverman, Doc. 269 at Appx 15-18, Appx 23-34.

Inc. v. Wechter, 683 S.W.2d 369, 374 (Tex. 1984), (3) imputation of loathsome disease, Memon v. Shaikh, 401 S.W.3d 407, 421 (Tex. App.—Houston [14th Dist.] 2013, no pet.), or (4) imputation of sexual misconduct. Memon, 401 S.W.3d at 421. Plaintiff says that the second and fourth categories are at issue,[26] and that the court should take judicial notice of Texas Penal Code § 22.01. Doc. 240 at 16; Doc. 255 at 26.

Section 22.01 of the Texas Penal Code defines the offense of assault. The only potentially applicable subsection is the second, which provides that a person commits assault if the person "intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse." Tex. Penal Code § 22.01(a)(2). Nothing in defendant's Facebook posts or email accuses Thomas of assault as defined in the Penal Code.

Defamation per se based on imputation of sexual misconduct refers to allegations of sexual molestation, adultery, and sexual assault. Cuba v. Pylant, 814 F.3d 701, 704-06 (5th Cir. 2016); Miranda v. Byles, 390 S.W.3d 543, 552 (Tex. App.—Houston [1st Dist.] 2012, pet. denied); Fox v. Parker, 98 S.W.3d 713,

---

[26] Plaintiff is no longer asserting that the first category applies. Other courts have determined that a student is not by definition engaged in a trade, profession, or business. See, e.g., Cain v. Atelier Esthetique Inst. of Esthetics, Inc., 182 F. Supp. 3d 54, 73 (S.D.N.Y. 2016)(explaining why extending the category to students makes little sense), aff'd, 733 F. App'x 8 (2d Cir. 2018); Kyung Hye Yano v. City Colleges of Chicago, No. 08CV4492, 2013 WL 842644, at *6 (N.D. Ill. Mar. 6, 2013), aff'd, 651 F. App'x 543 (7th Cir. 2016).

717 (Tex. App.—Waco 2003, pet. denied). Defendant did not make any such allegations.

Finally, as this court has previously noted, suicide is considered an unforeseeable intervening act. Doc. 228 at 14 (citing Estate of Ko by Hill v. Sears Roebuck & Co., 982 F. Supp. 471, 475 (E.D. Mich. 1997); Speer v. United States, 512 F. Supp. 670, 680 (N.D. Tex. 1981), aff'd, 675 F.2d 100 (5th Cir. 1982); Exxon Corp. v. Brecheen, 526 S.W.2d 519, 524 (Tex. 1975)). The ipse dixit of plaintiff or plaintiff's expert does not make it otherwise.

E.   Timeliness of the Facebook Claims

The alleged defamation occurred on May 19, 2016. Plaintiff filed his original complaint in this action on April 4, 2017. He filed his amended complaint adding the claims based on the Facebook posts on September 30, 2019, over three years after the alleged defamation.

Defendant maintains that plaintiff's claims based on the Facebook posts are untimely and cannot be pursued. Texas law allows one year to bring a defamation claim, so these claims are only timely if they relate back to the original complaint. Schirle v. Sokudo USA, L.L.C., 484 F. App'x 893, 901 (5th Cir. 2012). Relation back is determined by Texas law, which governs the defamation claims. Id. (citing Fed. R. Civ. P. 15(c)(1)). Under Texas law, a newly asserted claim relates back unless it

is "wholly based on a new, distinct, or different transaction or occurrence." Tex. Civ. Prac. & Rem. Code § 16.068. Texas law treats each alleged defamatory publication as a single transaction. Id.; TV Azteca, S.A.B. de C.V. v. Trevino Ruiz, 611 S.W.3d 24, 33 (Tex. App.—Corpus Christi 2020, no pet.); Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc., 291 S.W.3d 563, 587 (Tex. App.—Austin 2007, pet. denied). Thus, separate instances of defamation do not relate back. TV Azteca, 611 S.W.3d at 33; Tex. Disposal, 291 S.W.3d at 587-88.

Plaintiff argues that he was precluded from timely asserting his claims based on the Facebook posts because he learned of the posts while his appeal of the dismissal of his claims under the TCPA was pending. Doc. 255 at 23-25; Doc. 259. He relies on cases noting that limitations is tolled for a second cause of action in instances where the viability of that second action necessarily depends upon the outcome of the first case and pursuit of the second action prior to that outcome would either be improper or result in judicial complication.[27] Castillo v. Branch Banking & Tr. Co., No. 05-19-00854-CV, 2020 WL 1983361, at *5 (Tex. App.—Dallas Apr. 27, 2020, pet. denied);

---

[27] He also relies on cases pertaining to the identification of John Doe defendants, which are not pertinent here. Green v. Doe, 260 F. App'x 717 (5th Cir. 2007); Carillo Rivera v. Manpowergroup US, Inc., No. EP-19-CV-00299-DCG, 2020 WL 5913832 (W.D. Tex. Oct. 6, 2020). Both cases applied Fed. R. Civ. P. 15(c)(1)(C) regarding relation back and the fact that the plaintiff was not at fault in failing to timely identify the John Doe defendant. Here, nothing prevented plaintiff from filing suit against defendant upon learning of the Facebook posts.

Rogers v. Ricane Enters., Inc., 930 S.W.2d 157, 167 (Tex. App.—
Amarillo 1996, writ denied). In Rogers, the court declined to
apply tolling because the second action did not depend upon
successful outcome of the first. See Deutsche Bank Nat'l Tr. Co.
v. Ketmayura, No. A-14-CV-00931-LY-ML, 2015 WL 3899050, at *8
(W.D. Tex. June 11, 2015)(listing cases rejecting application of
tolling). That appears to be the case here where nothing would
have prevented plaintiff from filing suit against defendant
based on the Facebook posts at the time he learned of them.
Inasmuch as defamation claims are separate claims under Texas
law, the ruling on the appeal of the TCPA dismissal in this case
would not have precluded relief on the other claims.

F.    Failure to Comply with DMA

       Finally, the parties agree that failure to comply with the
DMA requirement that a plaintiff request correction,
clarification, or retraction bars recovery of exemplary damages.
Hogan v. Zoanni, 627 S.W.3d 163 (Tex. 2021); Warner Bros. Ent.,
Inc. v. Jones, 538 S.W.3d 781, 812 (Tex. App.—Austin 2017),
aff'd, 611 S.W.3d 1 (Tex. 2020). Plaintiff did not timely make
such a request.[28]

---

[28] He does not cite any authority to support the proposition that making a
request is not required if it would be futile.

G.    <u>Conclusion</u>

Based on the probative summary judgment evidence, plaintiff has not established the falsity of defendant's publications, that defendant defamed Thomas as a matter of law, or that defendant caused injury to Thomas as a matter of law. Defendant, on the other hand, has established his affirmative defense of truth and plaintiff has not raised a genuine fact issue as to truthfulness.[29] No reasonable juror could reach any other finding based on the summary judgment record.

VI.

Order

The court ORDERS that plaintiff's motion for partial summary judgment be, and is hereby, denied; defendant's motion for summary judgment be, and is hereby, granted; plaintiff take nothing on his claims against defendant; and, such claims be, and are hereby, dismissed with prejudice.

SIGNED April 6, 2022.

_____
JOHN McBRYDE
Senior United States District Judge

---

[29] Additionally, defendant has established that the publications do not constitute defamation per se, that plaintiff's Facebook claims are untimely, and that plaintiff's failure to comply with the DMA bars him from recovering exemplary damages.

36